UNITED STATES of America,
Plaintiff–Appellee,

v.

Timothy W. MARKLING,
Defendant–Appellant.

No. 92–2149.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 19, 1993.

Decided Oct. 21, 1993.

Christopher T. Van Wagner (argued), Office of the U.S. Atty., Madison, WI, for plaintiff-appellee.

T. Christopher Kelly (argued), Madison, WI, for defendant-appellant.

Before CUDAHY and MANION, Circuit Judges, and HOLDERMAN, District Judge.[*]

* Hon. James F. Holderman, District Judge for the Northern District of Illinois, is sitting by designation.

MANION, Circuit Judge.

Timothy Markling appeals his conviction for possessing cocaine with the intent to distribute it. Markling argues that the district court should have suppressed evidence found as the result of what he claims were illegal searches of his car and of the hotel room from which he had been selling cocaine. We conclude that we must remand this case to the district court for additional factual findings.

## I.

Rock County, Wisconsin narcotics officers began investigating Markling as a suspected cocaine dealer in early September 1991. On September 28, Detective Thomas Gehl, the leader of the investigation, learned that Markling, a Janesville, Wisconsin resident, had taken a room at the Janesville Motor Lodge. An informant had previously told Sergeant Laura Massey, another officer investigating Markling's activities, that Markling had been selling drugs from motels several weeks earlier. Gehl also knew from motel personnel that Markling had been registered as a guest at the Janesville Motor Lodge from September 5–7, 1991 and September 10–11, 1991.

For some reason, the motel management required Markling to be moved to a new room on September 28. Since Markling was not present at the motel when the time came for the room change, motel personnel moved his belongings. But although Markling was not there, Gehl was. Among Markling's possessions was a briefcase. While motel personnel were in the hallway moving Markling's belongings, Gehl asked if he could have the briefcase. Motel employees gave Gehl the briefcase. Gehl opened it, looked inside, and found some notes, a digital scale, and a glass bottle. Both the scale and bottle contained a white powder residue. After returning the scale and bottle to the briefcase, Gehl watched as motel employees took Markling's belongings to Room 304.

After inspecting the contents of Markling's briefcase, Gehl did two things. First, he assigned two officers to set up a surveillance post inside a room across an open area from Room 304. Next, Gehl applied for and obtained a warrant to search Room 304. In the warrant application, Gehl included information about the objects he had found inside Markling's briefcase. He also included much other information, including the following:

1. Between March 1991 and September 1991, the Rock County Metro Unit had received at least eleven separate pieces of information indicating that Markling was involved in cocaine distribution in the Janesville area.

2. Markling had been arrested on September 8, 1991 and had been found to be carrying $2,546 in cash.

3. After Markling's arrest on September 8, a black male arrived at the Janesville Police Department to pick Markling up. This happened even though Markling had not contacted anybody during his arrest or while he was at the police station. Investigation of the vehicle driven by Markling's "friend" showed that it was registered in Illinois to James Bivens.

4. A "reliable informant" had told police that during the week of September 4, 1991, somebody named "Tim," who was involved in cocaine trafficking, had been driving around Janesville with over three ounces of cocaine in his possession. According to the informant, "Tim" lived near the Five Points in Janesville. Markling lived within three blocks of the Five Points.

5. On September 23, the same "reliable informant" told Gehl that "Tim's" cocaine source was a black male from Illinois named James.

6. During the week of September 9, an informant told Sergeant Massey that Markling was selling drugs from motels. The informant did not know that Massey was a police officer.

7. Janesville Motor Lodge records showed that Markling had stayed at the motel from September 5 to September 7 and on September 10 and 11.

8. Gehl had met with the Janesville Motor Lodge's night manager on September 28. She told him that Markling had been staying at the motel since September 26 and that

motel personnel had noticed a lot of people coming to Markling's room for very short visits (in police parlance, "heavy 'short-term' traffic" to and from Markling's room). Gehl's training and experience had taught him that drug dealers often sell from hotel rooms, and that a large amount of "short-term traffic" to and from places from where drugs are being sold is common. The night manager also told Gehl, among other things, that Markling had received a telephone message from "James" that morning, and that a black male had stopped at the motel later and left a message that Markling could meet him at the "pancake house" in Beloit.

9. In the room Markling previously had occupied, the beds had not been slept in the night before his move to Room 304.

The surveillance of Markling's room continued on the following day, September 29. Early that afternoon, Markling left the room carrying a brown leather pouch. Gehl and another officer who were outside the motel saw Markling enter his car. Markling drove off, and the two officers followed him for a while until they lost sight of him. While following Markling, the officers saw him stop at several residences. One of those belonged to a man from whom undercover officers had previously purchased cocaine. Another residence was occupied by two women, Blanche Pomplum and Laurie Shetler, who were suspected drug buyers.

Markling returned to his motel room later that afternoon. Shortly before 5:00, Pomplum and Shetler came to Markling's room. They knocked on the door, and Markling let them in. After about six minutes, Pomplum and Shetler left. Outside the motel, Gehl stopped Pomplum and Shetler, searched them, and found two bags of cocaine base in Shetler's coat pocket. Shetler told Gehl that she had gotten the cocaine base from Markling. She also told Gehl that she thought Markling was "extremely paranoid" and would flush any other drugs in the room down the toilet if he became suspicious.

About an hour later, Gehl decided it was time to execute the warrant. Gehl and four other officers entered the room adjoining Markling's. One of the officers knocked on the door connecting the two rooms and

yelled, "Police! Search warrant!" Markling did not answer. After waiting about seven seconds, the officers continued to yell, and Gehl began swinging a battering ram at the door to try to knock it open. The door was more resistant than the officers had thought it would be; Gehl had to hit the door four to six times before it gave way.

The officers entered Markling's room. They found Markling curled up in a fetal position in the bathroom. After arresting and handcuffing Markling, the officers searched the room. The officers found the briefcase Gehl had inspected previously. Inside the briefcase they found cocaine and a scale. Aside from what was in the briefcase, the officers found other substantial evidence of cocaine dealing in the room, including more cocaine, and inositol, an agent commonly used to "cut" cocaine. Gehl also searched Markling's car in the motel parking lot. In the car, Gehl found a marijuana cigarette, some traffic tickets from Chicago, and some other documents.

## II.

■ Markling filed a motion to suppress the evidence found in the searches of his motel room and car. The district court denied that motion, prompting Markling to plead guilty. Markling now appeals his conviction. This presents a problem, however, because an unconditional guilty plea generally "waives all nonjurisdictional defects in the proceeding," including Fourth Amendment claims. 1 Charles Alan Wright, *Federal Practice and Procedure* § 175, at 624 (1982); see *United States v. Rinaldi*, 808 F.2d 1579, 1582–83 n. 3 (D.C.Cir.1987) (per curiam). Federal Rule of Criminal Procedure 11(a)(2) allows a defendant to enter a conditional guilty plea—that is, to reserve in his guilty plea the right to appeal "the adverse determination of any specified pretrial motions." But Rule 11(a)(2) requires that a conditional guilty plea be in writing and that the plea be approved by both the government and the district court. Fed.R.Crim.P. 11(a)(2); *United States v. Yasak*, 884 F.2d 996, 999–1000 (7th Cir.1989); *United States v. Fisher*, 772 F.2d 371, 374 (7th Cir.1985); *United States v.*

*Wong Ching Hing,* 867 F.2d 754, 758 (2d Cir.1989). The plea must also precisely identify which pretrial issues the defendant wishes to preserve for review, *Yasak,* 884 F.2d at 999, and demonstrate that a decision on one of those issues will " 'dispose of the case either by allowing the plea to stand or by such action as compelling dismissal of the indictment or suppressing essential evidence.' " *Wong Ching Hing,* 867 F.2d at 758 (quoting Advisory Committee Note to 1983 Amendment of Fed.R.Crim.P. 11); see also *Yasak,* 884 F.2d at 999.

■ Markling asserts that he expressly conditioned his guilty plea on his right to appeal the district court's denial of his suppression motion. However, Markling failed to include in the record on appeal any written plea agreement at all, much less a written plea agreement reserving the right to appeal from the district court's decision to deny his suppression motion. Moreover, the district court's docket entries do not indicate the existence of any written plea agreement.

Rule 11's writing requirement is not jurisdictional. Rather, "it is more in the nature of a right which can be waived" by the government. *Yasak,* 884 F.2d at 999. In *Yasak,* we upheld a conditional plea's validity despite the absence of a written plea agreement based on the defendant's guilty plea hearing transcript. That transcript revealed that the defendant and the government had agreed to a conditional plea, that the district court accepted the plea, and that the court understood that the plea was conditioned on the defendant's right to appeal the district court's denial of his motion to dismiss his indictment. *Id.* at 1000. Furthermore, the government stated on appeal its assent to the defendant's conditional plea. *Id.* Since the record assured us that the government had unequivocally assented to the defendant's appeal and that our decision would resolve the case, we held that the absence of a written agreement did not foreclose a conditional plea under Rule 11(a)(2). *Id.*

Unlike in *Yasak,* though, there is no transcript of Markling's plea hearing. The district court's docket sheet indicates that the only record of Markling's plea is a minute sheet. That minute sheet, which we obtained from the district court—the parties having failed to include it in the record on appeal—states only that Markling entered a plea, a plea agreement was read into the record, and the court found Markling guilty. The minute sheet does not indicate the plea agreement's terms.

However, although the docket sheet did not indicate its existence, the district court record includes a letter from the Assistant United States Attorney to Markling's attorney outlining the terms of Markling's proposed plea. (The parties also failed to include this letter in the record on appeal, so we obtained a copy from the district court.) That letter states that "[u]nder Rule 11(a)(2), the defendant will enter this plea of guilty expressly conditioned on reservation of his right to appeal from the final judgment herein in order to seek review of the court's January 24, 1992 ruling denying his Motion to Suppress Evidence. The Government consents to entry of this conditional plea."

■ The Assistant United States Attorney's letter indicates both that Markling entered a conditional plea and that the government agreed to a conditional plea. The parties' briefs on appeal confirm this. Markling's Statement of the Case asserts that he "entered a conditional guilty plea ... reserving the right to challenge the court's denial of his motion to suppress evidence on appeal." The government does not contest this statement; in fact, the government's brief states that the government "agrees with [Markling's] statement of the Case." The letter also sets forth the issue that Markling has preserved for review, and we are satisfied that resolving this issue will resolve the case in the sense relevant to Rule 11: If we affirm, Markling's plea will stand; if we find that any of the evidence Markling wants suppressed was illegally obtained, he may withdraw his plea if he desires. Under these circumstances, as in *Yasak,* the absence of a written plea does not foreclose review.

This is not to say that we condone the state of the record in this case. Rule 11(a)(2) expressly requires a written reservation of the right to appeal in a conditional guilty plea. And even when a written conditional

plea agreement does exist, the parties must make sure to include that agreement in the record on appeal. One reason that Rule 11(a)(2) requires a written reservation of the right to appeal is to foreclose any question about the plea's validity. A reviewing court should not have to piece together bits of evidence from both the record on appeal and in the district court to determine if a valid conditional plea exists. While we have undertaken that task in this case, litigants should not assume we will do so in the future. We reiterate what we stated in *Yasak:* "District courts should follow Rule 11's literal language and insist on written pleas under Rule 11(a)(2). The parties likewise should insist on them. This is especially so for defendants, for they have the most to lose if a plea is held invalid." 884 F.2d at 1000.

### III.

On the merits, Markling first focuses on the district court's finding that the evidence found in his motel room was admissible. Markling argues that because Gehl's application for the search warrant included information he obtained from his illegal warrantless search of the briefcase, the officers illegally searched his motel room. (The government does not dispute that Gehl's initial search of the briefcase was illegal.) Therefore all evidence the officers found in the search of his hotel room should be suppressed. The district court, following this court's holding in *United States v. Johnston,* 876 F.2d 589, 592 (7th Cir.1989), found that the police legally searched the motel room because the information in Gehl's warrant application, excluding the illegally obtained information, established probable cause to support the search warrant. Markling disagrees with both the district court's approach and conclusion but goes on to argue that even if the police legally searched his motel room, the district court still should have suppressed the evidence found in his briefcase because suppression is necessary to deter conduct like Gehl's prior illegal search.

Markling bases his argument concerning the admissibility of the briefcase's contents on *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). In *Segu-*

*ra,* government agents illegally entered an apartment and remained there while other agents obtained a search warrant. While in the apartment illegally, the agents observed considerable evidence of drug dealing. After the other agents arrived with the warrant, the search pursuant to that warrant turned up even more evidence of drug dealing. *Id.* at 800–01, 104 S.Ct. at 3383. The district court granted the defendants' motion to suppress all the evidence discovered while the agents illegally occupied the apartment, but held that the other evidence found during the search pursuant to the warrant was admissible. *Id.* at 803, 104 S.Ct. at 3384. The Supreme Court affirmed the court of appeals' ruling that the evidence discovered during the execution of the warrant was admissible. The warrant was valid and untainted by the initial illegal entry; therefore the evidence was admissible because the agents discovered it pursuant to an "independent source." *Id.* at 813–14, 104 S.Ct. at 3389–90; see also *Murray v. United States,* 487 U.S. 533, 537–38, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988).

According to Markling, the Court also held that the evidence discovered during the illegal entry could not be seized pursuant to the warrant, and he derives from this "holding" the general principle that evidence discovered during an illegal search can never lawfully be seized later. But the "holding" Markling relies upon does not appear in *Segura.* The government did not appeal the court of appeals' decision suppressing the evidence discovered during the illegal entry, so the question whether it was proper to suppress that evidence was not before the Supreme Court. See *id.* 468 U.S. at 804, 104 S.Ct. at 3384 ("no issue concerning items observed during the initial entry is before the Court"); see also *Murray,* 487 U.S. at 538, 108 S.Ct. at 2533 ("[t]he admissibility of what [the agents] discovered while waiting in the apartment was not before [the Court]" in *Segura*); *United States v. Salgado,* 807 F.2d 603, 607–08 (7th Cir.1986).

Cases since *Segura,* particularly the Supreme Court's decision in *Murray v. United States,* scotch Markling's argument that illegally discovered evidence can never law-

fully be seized later. In *Murray,* the Supreme Court explained the "independent source" exception to the exclusionary rule. Although the parties have not couched their arguments in those terms, whether or not the district court erred by refusing to suppress the evidence found in Markling's motel room—including the evidence found in the briefcase—involves application of the "independent source" doctrine.

■ To understand the independent source doctrine, one must begin with the competing interests at stake when courts decide whether to exclude evidence on Fourth Amendment grounds. The exclusionary rule is meant to deter illegal police conduct by punishing that conduct. *Salgado,* 807 F.2d at 607. The exclusionary rule attempts to accomplish this purpose by prohibiting the introduction of evidence obtained as the direct or indirect result of an illegal search. *Murray,* 487 U.S. at 536, 108 S.Ct. at 2532. The exclusionary rule thus deters illegal police conduct by removing the incentive for illegal conduct. But the exclusionary rule also involves significant social costs. The exclusionary rule deprives juries of probative evidence of a crime; and by depriving juries of probative evidence, the exclusionary rule often works at odds with society's interest in prosecuting and punishing crime. See *Nix v. Williams,* 467 U.S. 431, 442–43, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984). It is necessary to strike a balance between the competing interests. "The exclusionary rule is a sanction, and sanctions are supposed to be proportioned to the wrong-doing that they punish." *Salgado,* 807 F.2d 603 at 607.

The Supreme Court has determined that " 'the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position than they would have been in if no police error or misconduct had occurred.' " *Murray,* 487 U.S. at 537, 108 S.Ct. at 2533 (quoting *Nix,* 467 U.S. at 443, 104 S.Ct. at 2509) (emphasis in *Nix* ); see also *Salgado,* 807 F.2d at 607–08. Excluding evidence that the police ultimately obtained by independent legal means would not put the police in the same position

they would have been in if they had not committed any illegal conduct; instead, it would put them in a worse position. *Id.* The independent source doctrine avoids this by allowing the introduction of evidence discovered initially during an unlawful search if the evidence is discovered later through a source that is untainted by the initial illegality. *Id.*

Under the independent source doctrine, if police discover items $x$ and $y$ during an illegal search, but later discover item $z$ during an independent legal search, item $z$ is admissible in evidence because it was derived from an independent source. *Murray,* 487 U.S. at 537–38, 108 S.Ct. at 2533. That was the situation in *Segura.* See 468 U.S. at 813–14, 104 S.Ct. at 3389. But the doctrine as stated in *Murray* goes further. At issue in *Murray* was evidence that agents seized from a warehouse pursuant to a warrant after the agents had previously observed the evidence during an illegal entry into the warehouse. See *Murray,* 487 U.S. at 535–36, 108 S.Ct. at 2532. Under the independent source doctrine as stated in *Murray,* if during the untainted legal search police discover not only item $z$ but also rediscover items $x$ and $y$, $x$ and $y$ as well as $z$ are admissible. *Id.* at 538, 108 S.Ct. at 2533; see also *United States v. Herrold,* 962 F.2d 1131, 1140 (3d Cir.1992). Applied to this case, that means that if the police legally searched Markling's motel room and that search was untainted by Gehl's prior illegal search of the briefcase, all evidence found in the motel room—including that found in the briefcase—is admissible against Markling.

Thus, as in *Murray,* the question we face is whether the search of Markling's motel room pursuant to the search warrant "was in fact a genuinely independent source of" the evidence found there. *Murray,* 487 U.S. at 542, 108 S.Ct. at 2536. This inquiry, in turn, raises two questions. The first question is whether the illegally obtained evidence affected the magistrate's decision to issue the search warrant. See *Murray,* 487 U.S. at 542, 108 S.Ct. at 2535; *Herrold,* 962 F.2d at 1141; *United States v. Restrepo,* 966 F.2d 964, 969–71 (5th Cir.1992). The second question is whether Gehl's "decision to seek the

warrant was prompted by what he had seen" during his illegal search of the briefcase. In other words, would Gehl have applied for the warrant if he had not illegally searched the briefcase? See *id.; Herrold,* 962 F.2d at 1144; *Restrepo,* 966 F.2d at 971–72.

As to the first question, the district court found that even without the information Gehl discovered when he looked into Markling's briefcase, Gehl's warrant application established probable cause to search Markling's motel room. This is the approach federal courts, including this one, typically take in determining whether a search pursuant to a tainted warrant still provides an independent source for the discovery of evidence. In *United States v. Oakley,* 944 F.2d 384, 386 (7th Cir.1991), and *Johnston,* 876 F.2d at 592, we held that a search warrant procured in part on the basis of illegally obtained information will still support a search if the untainted information supporting the warrant, considered alone, is sufficient to establish probable cause. Many cases from other circuits follow the same rule. See, e.g., *Restrepo,* 966 F.2d at 968–71; *Herrold,* 962 F.2d at 1137–38, 1140–43; *United States v. Veillette,* 778 F.2d 899, 903–04 (1st Cir.1985); *United States v. Alexander,* 761 F.2d 1294, 1300 (9th Cir.1985); *James v. United States,* 418 F.2d 1150, 1151 (D.C.Cir.1969); see also *Johnston,* 876 F.2d at 594 (Posner, J., concurring) (citing cases).

■ This approach is a logical application of the Supreme Court's reasoning in *Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). In *Franks,* the Court held that when a government agent deliberately or recklessly includes false information in a warrant application, the warrant is still valid if the other information in the application, standing alone, is sufficient to establish probable cause. *Id.;* see also *United States v. Pace,* 898 F.2d 1218, 1231 (7th Cir.1990). Suppose Gehl had lied about knowing that Markling possessed the items in the briefcase; in that case, *Franks* would require that we uphold the warrant if the other information in the application established probable cause. If we may uphold a warrant based on an application including knowingly false information

if the other information in the application establishes probable cause, it is logical to conclude that we may uphold a warrant based on an application including illegally obtained information under the same circumstances. See *Veillette,* 778 F.2d at 904.

There is language in *Murray,* however, that could be read as casting doubt on this *Franks*-based approach to determining whether a search pursuant to a tainted warrant will support admission of evidence under the independent source doctrine. In *Murray,* the Court stated that a search pursuant to a tainted warrant is not an independent source "if information obtained during [the illegal search] was presented to the Magistrate and affected his decision to issue the warrant." 487 U.S. at 542, 108 S.Ct. at 2536. Taken literally, this language indicates that the relevant inquiry focuses not on whether the warrant application establishes probable cause absent the tainted information, but rather on "the *actual* effect of the illegally acquired information upon a *particular* magistrate." 4 Wayne R. LaFave, *Search and Seizure* § 11.4, at 82 (Supp.1992) (emphasis in original).

We applied the *Franks*-based approach in both *Johnston* and *Oakley,* cases decided after the Supreme Court decided *Murray.* In neither case did we discuss *Murray*'s effect on the *Franks*-based approach. However, the Fifth and Third Circuits in *Restrepo* and *Herrold* discussed this question and concluded that *Murray* does not alter the *Franks*-based rule that a search pursuant to a search warrant supported by probable cause absent any tainted information provides an independent source for the discovery of evidence. See *Restrepo,* 966 F.2d at 969–70; *Herrold,* 962 F.2d at 1141–43. We agree with this conclusion. Other than the sentence fragment quoted above, there is no indication in *Murray* that the Court intended to reject—or even that it was considering— the prevailing *Franks*-based rule. A rule focusing on the tainted information's actual influence on a particular magistrate would be inconsistent with *Franks;* yet, the Court in *Murray* did not cite *Franks,* much less attempt to reconcile *Murray* with *Franks.* Nor did the Court discuss the prevailing rule

or cite any of the numerous cases applying that rule. And, in any event, the language in *Murray* concerning whether the tainted information "affected [the magistrate's] decision" was dictum—that is, it was unnecessary to the disposition of the case—because in *Murray* the agents had never presented to the magistrate the information obtained from their illegal entry. See *Restrepo*, 966 F.2d at 970 n. 13; LaFave, *supra*, § 11.4, at 83.

> Given all these factors, we agree that the Court's use of "affect" in *Murray* must be understood to signify affect in a substantive manner. Thus, the fact that an application for a warrant contains information obtained through an unlawful entry does not perforce indicate that the improper information "affected" [the magistrate's] decision to issue the warrant and thereby vitiate the applicability of the independent source doctrine. Rather, if the application contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, provided that the officers were not prompted to obtain the warrant by what they observed during the initial entry.

*Restrepo*, 966 F.2d at 970 (quoting *Herrold*, 962 F.2d at 1141–42).

Does the untainted information in Gehl's warrant application establish probable cause to search Markling's motel room? Markling argues it does not. His method of argument is to attack each piece of information in the affidavit separately, complaining about lack of informant credibility here and conjuring up innocent explanations for his behavior there. But determining whether probable cause exists involves "a practical, common-sense decision whether, given all the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Rather than viewing bits and pieces of a probable cause showing in isolation, the court must focus on all the facts presented to the magistrate. Even otherwise innocent behavior can arouse suspicion in light of other circumstances. See *id.* at 243–44, 103 S.Ct. at 2234–35; *United States v. Pace*, 898 F.2d at 1232.

We agree with the district court that viewed in the proper light, the untainted information in Gehl's warrant application established probable cause to search Markling's motel room. The warrant application showed that Markling was involved in cocaine distribution. The application also showed that Markling dealt drugs from motel rooms. During the time in which he was dealing (early September 1991), he had stayed two separate times at the Janesville Motor Lodge. He was staying at the Janesville Motor Lodge the weekend of September 26, and a lot of people were seen coming to his room for short visits, activity common to drug transactions. Several facts corroborate the informants' statements about Markling. First, the sheer number (eleven separate pieces of information that Markling was involved in cocaine distribution) lends the accusations some weight. Also, the informant who told Sergeant Massey that Markling was selling drugs from motels did not know Massey was a police officer. Another informant knew the general location of Markling's home, and knew that Markling's source was a black man from Illinois named James. It just so happened that when Markling was arrested on September 8, a black man driving a car registered in Illinois to James Bivens showed up to pick Markling up. There is more, but it suffices to say that the untainted information in Gehl's warrant application, while maybe not conclusive evidence, at least supports a "practical, common-sense determination" that a fair probability existed of finding evidence of drug dealing in Markling's motel room.

But as *Murray* made clear, answering the probable cause question does not end our inquiry. We must also consider whether Gehl would have applied for a warrant if he had not searched Markling's briefcase. As in *Murray*, however, the district court made no finding on this issue. Consequently, as in *Murray*, we must remand this case to the district court to make that factual finding. See 487 U.S. at 543, 108 S.Ct. at 2536. If the district court finds that Gehl would have sought a warrant even if he had not looked into Markling's briefcase, Markling's guilty plea will stand. But if the court finds that

searching Markling's briefcase prompted Gehl to seek a warrant, the court must suppress the evidence found in the search of Markling's hotel room and allow him to withdraw his guilty plea, unless the government can justify introduction of the evidence on some other basis.[1]

## IV.

◼ Markling also asserts that even if the search warrant was valid, we must still suppress the evidence found in his motel room because the police did not give him an opportunity to answer his door before entering his room by force. The federal "knock and announce" statute, 18 U.S.C. § 3109, allows police officers to "break open a ... house ... to execute a search warrant if, after notice of his authority and purpose, he is refused admittance...." As this circuit has noted before, the word "if" in § 3109 means "only if"; therefore, police officers may enter a house by force to execute a warrant only if they have properly announced their authority and purpose and are refused admittance, unless an emergency or some other extenuating circumstance exists. *United States v. Leichtnam*, 948 F.2d 370, 373 (7th Cir.1991). The parties agree that Wisconsin law governing a search warrant's execution is the same as federal law, so we need not decide whether federal or Wisconsin law applies, or differentiate between the two.

◼ The requirement that police be "refused admittance" implies that the announcement of authority "must be followed by a pause long enough for someone to answer or come to the door." *Leichtnam*, 948 F.2d at 374. Markling does not dispute the district court's finding that the officers announced

their authority and purpose by yelling "Police! Search warrant!" Rather, his argument centers on whether or not the officers were "refused admittance"—that is, whether they waited long enough—before starting to break the door down.

The district court found that the officers waited seven seconds before starting to try to knock the door down. We agree with the district court that given the circumstances, the seven-second wait was sufficient to comply with § 3109. There was no noise coming from the apartment, such as a television or radio, that would have made it difficult for Markling to hear the officers' loud announcement of their presence and authority. The motel room was small. The officers had been told by two women who had just bought cocaine from Markling that he was likely to flush the cocaine he had in his room down the toilet. All these factors made it reasonable for the officers to conclude that Markling was not going to answer the door. Cf. *United States v. DeLutis*, 722 F.2d 902, 909 (1st Cir.1983) (court held that 20-second wait was sufficient and cited cases approving forced entry after as little as 10-second wait); *United States v. One Parcel of Real Property*, 873 F.2d 7, 8–9 (1st Cir.1989) (fact that officers believe room's occupants might possibly flush cocaine down a toilet justifies a short wait before entry).

◼ Markling argues, however, that the district court clearly erred by finding that the officers waited even seven seconds before starting to knock down his door. According to Markling, "the most credible evidence" showed that the police did not wait at all before turning the battering ram on his door. But it is not for us or Markling to decide

---

1. The government has argued that the briefcase's contents are admissible under the inevitable discovery rule approved in *Nix*, 467 U.S. 431, 104 S.Ct. 2501. Under the inevitable discovery doctrine, illegally obtained information is admissible if the information would inevitably have been discovered by lawful means. *Id.* at 444, 104 S.Ct. at 2509. While the inevitable discovery and independent source doctrines are closely related, they are not the same. The inevitable discovery doctrine applies where evidence is not actually discovered by lawful means, but inevitably would have been. Its focus is on what would have happened if the illegal search had not

aborted the lawful method of discovery. The independent source doctrine, however, applies when the evidence actually has been discovered by lawful means. Its focus is on what actually happened—was the discovery tainted by the illegal search? See *Herrold*, 962 F.2d at 1140. We do not discuss inevitable discovery because the district court made no findings on that issue. If the court finds that Gehl illegally searched Markling's motel room, it may go on to analyze whether the police inevitably would have discovered the evidence through other, legal means. We express no view on the merits of the government's inevitable discovery argument.

what is "the most credible evidence." That decision is for the district court, which has both the institutional responsibility to find facts and the opportunity to sort out all the evidence in light of its personal observation of the witnesses. We overturn a district court's factual finding only if that finding is clearly erroneous or, put another way, only if that finding " 'strike[s] us as wrong with the force of a five-week old, unrefrigerated dead fish." *United States v. Di Mucci*, 879 F.2d 1488, 1494 (7th Cir.1989) (quoting *Parts and Electric Motors v. Sterling Electric, Inc.*, 866 F.2d 228, 233 (7th Cir.1988)). The district court's finding that the officers waited seven seconds is supported by their testimony, and the officers reasonably explained contradictions that Markling points to between that testimony and the officers' written reports of the search warrant's execution. The district court's finding that the officers waited seven seconds before starting to knock down Markling's door is not clearly erroneous. Since, under the circumstances, seven seconds was not an unreasonably short time for the officers to wait before concluding that Markling was not going to let them into the room, the district court correctly found that the forced entry did not violate § 3109.

### V.

 Markling finally argues that the district court should have suppressed the evidence Gehl found when he searched Markling's car without a warrant. We agree with the district court that the automobile exception to the warrant requirement justified Gehl's warrantless search. Under the automobile exception, a police officer may search a car without a warrant if he has probable cause to believe the car contains contraband or evidence of a crime. See, e.g., *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Chambers v. Maroney*, 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970); *California v. Carney*, 471 U.S. 386, 390–94, 105 S.Ct. 2066, 2068–70, 85 L.Ed.2d 406 (1985). Two considerations justify the automobile exception: the lessened privacy expectation a person has in a car, as opposed to his home, and a car's ready mobility. See *Carney*, 471 U.S. at 391, 105 S.Ct. at 2069. These two justifications come into

play "[w]hen a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes...." *Id.* at 392, 105 S.Ct. at 2070.

The considerations underlying the automobile exception apply in this case. Gehl found Markling's car in the motel parking lot, a place readily accessible to the public and not normally thought of as a place regularly used as a residence. One of Markling's friends or associates could have moved the car at any time. In fact, Gehl knew that "James," who was Markling's likely cocaine source, was still in the area, and he knew from Markling's prior arrest that James kept close watch on Markling.

 The only question left is whether Gehl had probable cause to believe that Markling's car contained evidence of drug dealing. We agree with the district court that probable cause existed. Gehl knew that Markling had been known to carry drugs in his car in the recent past. He also knew from surveillance of Markling that Markling had used his car to make trips to and from the motel. Gehl could reasonably conclude that those trips likely had something to do with Markling's cocaine dealing. Two of the stops that Markling had made on his September 29 excursion were to the house of a man from whom officers had previously purchased cocaine and to the residence of Blanche Pomplum and Laurie Shetler, who purchased cocaine from Markling in his motel room later that afternoon. From all this Gehl could make a common-sense determination that Markling's car would probably contain evidence of drug dealing. Under the automobile exception, this justified Gehl's warrantless search of Markling's car.

### VI.

We affirm the district court's conclusions that the police legally searched Markling's car, that the police did not violate the knock and announce requirement when entering Markling's motel room, and that Gehl's affidavit established probable cause to search Markling's motel room even absent the evidence Gehl discovered when he searched

**1320**

Markling's briefcase. We remand to the district court for a finding on whether Gehl would have sought a warrant had he not searched the briefcase and for any other necessary proceedings consistent with this opinion.