In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2527

United States of America,

Plaintiff-Appellee,

v.

Kip R. Jones,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:97CR20062--Michael P. McCuskey, Judge.

Argued January 11, 2000--Decided May 26, 2000

Before Coffey, Easterbrook, and Evans, Circuit Judges.

Easterbrook, Circuit Judge. Kip Jones pleaded guilty to a cocaine offense, reserving the right to appeal from the denial of his motion to suppress evidence. See Fed. R. Crim. P. 11(a)(2). Police entered Jones's apartment on the authority of a search warrant. Jones does not dispute the validity of the warrant, but he does protest the manner of its execution.

An officer pounded loudly on the door, shouting "Decatur Police! Search warrant! Open the door!" When the occupants did not respond, the officer tried the door, found it unlocked, and opened it slightly. A second officer hit the door with a battering ram, and it flew open. One of the officers looked into the living room and, seeing no one, tossed in a concussion grenade (which the police call a "flash-bang device"). A concussion grenade produces a brilliant flash and a loud noise designed to stun and disorient persons nearby, making resistance less likely. A member of the police team found Jones at a table approximately 15 to 20 feet from the front door and instructed him to "get down." Instead, Jones stood up and was tackled, being struck on the right side of the neck in the process. Officers then handcuffed Jones, who had been unarmed, and conducted their search, finding marijuana, cocaine, and equipment for weighing drugs. No weapon was to be found in the apartment, though

the officers did locate 26 rounds of ammunition. While the search continued, Jones initiated a conversation with some officers, who moved him to the bedroom, administered Miranda warnings, and took a statement in which Jones admitted dealing in these drugs and sought to open negotiations about the exchange of lenience for additional cooperation.

Jones does not contend that the officers violated 18 U.S.C. sec.3109 or the fourth amendment, see Wilson v. Arkansas, 514 U.S. 927 (1995), by giving insufficient notice before using the battering ram. What he does contend is that the entry was conducted in an unreasonable manner--that it was gratuitous to use a battering ram on a door already open, to throw an explosive device into the apartment (especially because the police knew that Jones's girlfriend and her six-year-old child were present), and to tackle him when, perhaps stunned by the explosion, he did not immediately drop to the floor. The district court held that the officers' conduct was reasonable in all respects. We are less certain. Richards v. Wisconsin, 520 U.S. 385 (1997), rejects an argument that drug dealers are invariably so dangerous that no-knock entries are proper; by the same token, police cannot automatically throw bombs into drug dealers' houses, even if the bomb goes by the euphemism "flash-bang device." The police did not believe that Jones was an unusually dangerous drug dealer. True, his criminal record included a weapons offense (for which Jones had received a non-custodial sentence), and guns are common in the drug trade, but this was a given in Richards as well. Police had little reason to apply a battering ram to a door that was already ajar, and using the concussion grenade created a risk that people close to the detonation point would be injured. Children are especially vulnerable, and the officers knew that one was in the apartment. Although they peeked inside the living room, planning not to use the device if they saw the child, they could have missed someone in a corner or behind the furniture. A child who hears the door being broken down is likely to hide.

If this were a damages action seeking compensation for injury to the occupants or the door, the claim would be a serious one. But it is not a damages action, so whether one would succeed is not something we need decide. Jones wants us to hold that the fourth amendment precludes the use of the evidence that the officers found in his apartment. That argument must be rejected for a reason unrelated to the strength of the contention that the officers behaved inappropriately: the exclusionary rule depends on causation. A warrant authorized the

entry, so seizure of evidence was inevitable. Murray v. United States, 487 U.S. 533, 536-41 (1988). A battering ram, flash-bang device, or blow to the neck could affect the seizure only by surprising or stunning the occupants so that they could not destroy evidence. The principal function of a concussion grenade is to protect officers from weapons fire, not to uncover evidence otherwise concealed. An argument that the suspects would have destroyed the drugs, if only they had more time and full possession of their faculties, is not a good reason to suppress probative evidence of crime. See Segura v. United States, 468 U.S. 796, 813-16 (1984). No other causal chain could be at work, so as in other inevitable-discovery cases the officers' errors (if errors they were) do not lead to suppression. See Nix v. Williams, 467 U.S. 431 (1984). See also United States v. Jones, 149 F.3d 715 (7th Cir. 1998).

Jones's statement similarly is admissible, for his custody was lawful, and he does not contend that 30 minutes after the entry he was still so disoriented by the explosion that the statement was involuntary. A confession that occurs during unlawful custody, or was influenced by unlawfully seized evidence, must be suppressed unless intervening events demonstrate that the illegality did not cause the confession. Oregon v. Elstad, 470 U.S. 298 (1985); Brown v. Illinois, 422 U.S. 590 (1975); Wong Sun v. United States, 371 U.S. 471 (1963). Because Jones was in lawful custody, cases such as Brown do not assist him. See New York v. Harris, 495 U.S. 14 (1990). Given the inevitable-discovery doctrine, the police were not in possession of any forbidden fruit. If the police had used spray paint to decorate Jones's door with graffiti, or stolen a family heirloom, these unlawful acts would not have spoiled a confession, because they would not have induced an innocent person to confess (or even made it more likely that a guilty person would do so). Just so here.

Only a link between the manner of the entry and the statement would set up a claim to suppression, and Jones does not try to establish such a link. His argument supposes that the discovery of the drugs was itself unlawful. Jones contends that the entry "was for the very purpose of trying to find illegal drugs, and then to use the finding of the drugs as leverage to obtain [his] confession". The idea, in other words, is that a person knowing that the police had the goods on him would confess as part of a strategy to negotiate for terms. Jones, who initiated the conversation that culminated in his confession, does not suggest any other way in which the manner of entry led to his statement. Because

both the seizures and the custody were lawful, the confession is admissible.

Affirmed




   COFFEY, Circuit Judge, dissenting in part and concurring in judgment. I am forced to write separately because I am convinced that the majority's opinion is unsupported by the law and the facts of the case, and furthermore it may have an impact on the ability of law enforcement personnel to protect themselves when planning a safe entry into a known drug dealer's residence. Given that this case depends heavily on the facts, I believe a more thorough description of the facts and circumstances is in order.

The Controlled Delivery of the Drugs

   On December 10, 1997, San Bernardino County, California, Sheriff's deputies stopped the automobile of one Hector Baez for traffic violations. After questioning the suspect, the officers became suspicious and asked Baez if they could search his vehicle. After Baez consented to the search, the officers discovered one kilogram of cocaine, 18.47 kilograms of marijuana, two clips of ammunition, and a nine-millimeter handgun.

   After his arrest, Baez agreed to cooperate with the police and informed them that he had obtained the drugs from a Hispanic man in Los Angeles and that he was en route to deliver them to the defendant-Jones in Decatur, Illinois, in exchange for $51,000. Baez agreed to cooperate with law enforcement officers and was transported, under surveillance, to Decatur, Illinois. Upon his arrival, Baez made a recorded telephone call to Jones and informed him that he was approximately an hour away. Baez, after being fitted with an electronic monitoring device and still under surveillance, then drove to Jones's apartment to make the controlled delivery of the cocaine and marijuana.

   When Baez arrived at Jones's apartment on December 11, 1997, Baez was greeted by Janice Warden, Jones's girlfriend, and her six-year-old son, Marcus, both of whom lived with Jones. Warden invited Baez into the apartment and advised him that, although Jones was not present, he would return in about 45 minutes. Shortly thereafter, Jones arrived at the apartment and

the two men went to Baez' car and retrieved the drugs from the trunk of the car and returned to the apartment.

Thereafter, the two men engaged in a brief conversation, and Jones explained to Baez how he prepared crack cocaine. During their conversation, Baez told Jones that he had to get his pager from his car. The pager comment, carried over the wire, was a prearranged signal to alert the police that the narcotics transaction had been completed and that Baez was leaving the apartment. Once Baez left Jones's apartment,/1 the Emergency Response Team (ERT) proceeded according to their planned execution of the search warrant.

The Execution of the Search Warrant/2

Immediately after Baez left Jones's apartment under the pretense of getting his beeper, the lead ERT member, Officer David Kemp, pounded on Jones's apartment door about five times with a crowbar-type tool, and yelled as loud as he could, "Decatur Police! Search Warrant! Open the door!" Officer Kemp then waited four to five seconds, but heard no response from inside the apartment. After no response was forthcoming, Officer Kemp tried the doorknob to determine the amount of force that would be necessary to punch the door open. The door was unlocked and Officer Kemp opened it just enough to allow a "sliver of light" to come into the apartment. At this time, Officer Kemp moved aside and Officer Cody Moore, hit the door with a battering ram./3

As the door swung open from the use of the instrument, Officer Kemp looked into the living room. Upon determining that there was no one present in the living room, he threw a "flash-bang" device/4 into the living room and stepped aside. Just as the flash-bang detonated, the third ERT member, Officer Scott Hastings, rapidly entered the apartment.

As soon as Officer Hastings entered the apartment, he began yelling, "Police, get down, get down!" Instead of getting down, Jones, who was seated at the table, "abruptly" stood up with his hands at his side and, as the majority fails to note, in a position where the officer could not tell whether Jones was armed because he could not see his hands. According to the testimony at the suppression hearing, Officer Hastings "couldn't tell whether [Jones's hands] were clenched open or whether they had anything in them." In fact, Officer Hastings "couldn't see [Jones] until [he] was within . . . a foot or two from him."/5

Also contrary to the majority opinion, Jones was not immediately tackled when he stood up. Rather, as Officer Hastings advanced toward Jones, he continued to holler at him to get down. It was only after Jones failed to comply with the officer's repeated commands that Hastings ran around the dining room table and tackled Jones. According to Officer Hastings, "[a]s we fell to the ground, I was on top of him, and I saw that he did not have any weapons on his person. [Jones] actually said, I don't have anything, I don't have anything on me. You know, any weapons." After determining that Jones was unarmed, Officer Hastings removed himself from atop Jones's body and proceeded to handcuff him and seat him in a chair.

Once the ERT officers secured Jones, they conducted a thorough search of his apartment. They discovered the 1 kilogram of cocaine and the 18.47 kilograms of marijuana on the dining room table near a set of triple-beam scales. The agents also found electronic digital scales, drug paraphernalia, and one gram of crack cocaine. Officers also recovered, which the majority fails to note, 26 rounds of .22 caliber ammunition from Jones's bedroom.

While Inspectors Root and Trevor Stalets were conducting the search, several ERT members informed them that Jones wished to talk with them. After approximately thirty minutes, during which time the police conducted their systematic search of the apartment, Jones was escorted into one of the bedrooms with Agent Warren, Inspector Root, and Master Sergeant Willy Hood. Agent Warren advised Jones of his Miranda rights in the presence of the other two officers, and Jones verbally waived his rights and gave an oral statement admitting that he had received the marijuana and cocaine from Baez, and proceeded to characterize himself as a middle man in the drug enterprise. Jones went on to state that he was responsible only for checking the quantity and quality of the drugs delivered, and that he would be willing to cooperate with law enforcement in the future.

The Suppression Hearing

Before entering a conditional plea of guilty, Jones filed a motion to suppress, arguing that the method in which the officers entered the apartment and subdued him made the execution of the search warrant unreasonable, and that his statement, which immediately followed this alleged fourth amendment violation, should therefore be suppressed under the "fruit of the poisonous tree" doctrine./6 The district judge, after hearing evidence from Agent Warren, Officer

Kemp, and Officer Hastings, denied Jones's motion to suppress, stating that the fact that "the defendant had weapons charges in the past" and "[t]he large amount of . . . drugs [present] certainly would give an objective statement to a reasonable officer that danger could certainly await the officer and the occupants of the building upon entry in this type of search." (emphasis added). Based on these facts and the applicable caselaw, the judge proceeded to deny Jones's motion to suppress.

On appeal, Jones argues that the district court erred in denying his motion to suppress because the manner in which the police executed the search warrant was unreasonable and the statements given to the police, at that time, were the direct result of an alleged fourth amendment violation and should therefore be suppressed as fruit of the poisonous tree. The majority attempts to answer this question in one paragraph, without any detailed analysis of the caselaw, by simply claiming that there is no connection between the manner of entry and Jones's subsequent confession. However, the Supreme Court (not to mention this court) has mandated that we undertake a more thorough analysis. See Taylor v. Alabama, 457 U.S. 687, 690 (1982) ("This Court identified several factors that should be considered in determining whether a confession has been purged of the taint of the illegal arrest: [t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct."); see also Dunaway v. New York, 442 U.S. 200 (1979); Brown v. Illinois, 422 U.S. 590 (1975); Wong Sun v. United States, 371 U.S. 471 (1963); United States v. Ienco, 182 F.3d 517 (7th Cir. 1999); United States v. Patino, 830 F.2d 1413 (7th Cir. 1987).

"When reviewing the denial of a motion to suppress, we review the district court's conclusions of law de novo, and we review the court's findings of fact for clear error." United States v. Taylor, 196 F.3d 854, 859-60 (7th Cir. 1999).

As we have stated in the past:

The exclusionary rule is a judicially created remedy that prohibits the government from introducing at the defendant's trial evidence of guilt obtained through violations of the Fourth Amendment. United States v. Leon, 468 U.S. 897, 906, 104 S. Ct. 3405, 82 L. Ed.2d 677 (1984). A district court's application of the fruit of the poisonous tree doctrine in the context of the Fourth Amendment is reviewed de novo. United

States v. Elie, 111 F.3d 1135, 1140 (4th Cir. 1997). The test for determining the admissibility of evidence obtained through a chain of causation that began with an illegal arrest is "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed.2d 441 (1963) (quoting Maguire, Evidence of Guilt, 221 (1959)). Thus, if the causal chain between the initial illegality and the evidence sought to be excluded is broken, the link to the evidence is sufficiently attenuated to dissipate the taint of illegal conduct. United States v. Green, 111 F.3d 515, 521 (7th Cir. 1997). It has been noted that the purpose of this attenuated connection test is to mark the point of diminishing returns of the deterrence principle inherent in the exclusionary rule. LaFave, Search and Seizure, sec. 11.4(a), at 235 (1996). Moreover, "[i]t is critical that courts wrestling with 'fruit of the poisonous tree' issues keep that fundamental notion in mind, for when it is lost sight of the results can be most unfortunate." Id.

Ienco, 182 F.3d at 526. Therefore, Jones must establish that the police officers' entry into his home violated the fourth amendment and, if he succeeds in establishing such a violation, that the violation resulted in (or was connected to) his confession statement. See, e.g., United States v. Nava-Rameriz, No. 99-4123, 2000 WL 368399 at *2 (10th Cir. Apr. 10, 2000).

In an attempt to establish a fourth amendment violation, Jones argues that the ERT's search of his apartment was unreasonable due to the "para-military" manner in which the ERT executed the search warrant. Specifically, Jones points to the ERT's use of: 1) a battering ram to open the unlocked front door to his apartment; 2) the flash-bang device; and 3) excessive force in taking him into custody.

Instead of answering these allegations, the majority gratuitously gift wraps a section 1983 claim by stating that "[i]f this were a damages action seeking compensation for injury to the occupants or the door, the claim would be a serious one." Then the majority, without any detailed analysis, merely draws the unsupported conclusion that there is no connection between the manner of entry (which the majority suggests violates the fourth amendment)/7 and the confession.

Instead of focusing on the connection between

the officers' entry and the confession (the majority makes little effort to distinguish the facts of this case from cases like Taylor, Dunaway, Brown, Wong Sun, Ienco, and Patino), I am convinced that the officers, even though I might not have implemented the same modus operandi, were, under the facts and circumstances of this case, acting in a legal albeit aggressive manner. As the saying goes, don't judge a man until you have walked a mile in his boots. See Graham v. Connor, 490 U.S. 386, 396 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment."). Consequently, I am of the opinion that there is no need to reach the attenuation question that the majority addresses.

The ERT's Use of a Battering Ram to Open Jones's Front Door

Initially, Jones argues that the ERT's execution of the search warrant was unreasonable because "[t]here was simply no basis for agents to use a battering ram to break open an unlocked door." But, Jones's argument is misplaced.

In this case, Officer Kemp pounded on Jones's apartment door approximately five times with a crowbar-type tool while loudly announcing "Decatur Police! Search Warrant! Open the Door!" He then waited four to five seconds, and still there was no response from within the apartment nor did anyone appear at the door to open it. So, pursuant to instructions from his ERT commander, Officer Kemp tried the doorknob, and discovering that the doorknob turned, opened the door slightly, and stepped aside. Officer Moore then hit the door with a hand-held battering ram and the door flew open.

Under 18 U.S.C. sec. 3109, a law enforcement officer is permitted to "break open any outer or inner door or window of a house . . . to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance." The function of section 3109 is to "afford the occupant notice so that he may open the door peaceably." See United States v. Bragg, 138 F.3d 1194, 1195 (7th Cir. 1998). As Bragg points out, "[i]f the officer 'is refused admittance'--and failure to answer the door is a form of refusal . . .--then the door may be broken to execute the warrant." Id. (emphasis added).

The ERT officers complied with section 3109. They clearly announced their presence by knocking on the door five times while shouting "Decatur Police! Search Warrant! Open the door!" They then provided Jones, who was approximately fifteen

feet from the door, with ample opportunity (at least seven seconds according to the district court) to either open the door or to verbally acknowledge their presence. In United States v. Markling, 7 F.3d 1309, 1318 (7th Cir. 1993), we found that a wait of seven seconds was sufficient where the apartment was small and there was no reason to think the occupant could not hear the police knock and announce. In this case, the trial judge made a specific finding that the officers waited "at least a minimum of seven [seconds] and clearly more." Here, as in Markling, the apartment was small and there was no reason, such as a stereo playing loud music, why Jones could not hear Officer Kemp knock and announce.

I agree with the district court that there is no bright-line rule regarding how much time is reasonable. See, e.g., United States v. Spikes, 158 F.3d 913, 926 (6th Cir. 1998), cert. denied, 119 S. Ct. 836 (1999) ("The Fourth Amendment's 'knock and announce' principle, given its fact-sensitive nature, cannot be distilled into a constitutional stop-watch where a fraction of a second assumes controlling significance."); United States v. Jones, 133 F.3d 358, 361 (5th Cir.), cert. denied, 118 S. Ct. 1854 (1998) ("We will resist the temptation to create a bright-line standard for all cases, i.e., five seconds or less is not long enough and more than five seconds is."). Thus, courts have refused to establish a specific time frame or set of conditions before an officer may use a battering ram to forcefully enter a residence because such a determination must depend on the particulars of each case. See Markling, 7 F.3d at 1318; see also Spikes, 158 F.3d at 926 ("Whether police officers paused long enough before admitting themselves into a home thus entails 'a highly contextual analysis, [requiring] examin[ation of] all the circumstances of the case.'") (quoting United States v. Bonner, 874 F.2d 822, 824 (D.C. Cir. 1989)). Accordingly, I am convinced that the ERT, under the facts of this case, reasonably construed Jones's failure to answer his door after at least seven seconds as an implied refused admittance, see Bragg, 138 F.3d at 1195, and thus Officer Moore's use of a battering ram to open the apartment door, which may have been chained, booby trapped, otherwise blocked, or had people hiding behind it who were positioned to physically assault, or fire upon, the officers, was within the limits of the fourth amendment.
The ERT's Use of a Flash-Bang Device

Jones next argues that the ERT's execution of the search warrant was unreasonable because "[t]here was simply no basis for agents to . . . fire an explosive device into an apartment in

which a six-year-old child was present." But, once again, Jones ignores the facts of this case.

It is important to note that Jones had just received a very large quantity of drugs (almost 20 kilograms) from Baez, and, as pointed out earlier, it is well known that drug dealing is a crime infused with violence. See, e.g., United States v. Brown, 188 F.3d 860, 865 (7th Cir. 1999); United States v. Gambrell, 178 F.3d 927, 929 (7th Cir.), cert. denied, 120 S. Ct. 281 (1999); United States v. Stowe, 100 F.3d 494, 499 (7th Cir. 1996). Beyond the violent nature of the drug trade and the fact that when this amount of narcotics is present drug dealers are likely to be armed (as was Baez), the ERT knew that Jones had been previously arrested for, and pled guilty to, a gun violation. According to testimony, ERT members also had other "knowledge either directly or through others about Mr. Jones possessing firearms" on two other occasions. It was, therefore, reasonable for them to assume that Jones might be armed, a belief that was further supported by the discovery of 26 rounds of ammunition, ammunition that obviously was not used for art displays or decorations.

Under circumstances such as these, where the police have a sound basis for believing that an occupant is armed, I agree with the trial judge and believe that the use of a flash-bang is an appropriate means of disorienting the occupant so that officers can protect themselves when they enter the apartment in order to serve the search warrant and proceed with the authorized search of the premise. See United States v. Myers, 106 F.3d 936, 940 (10th Cir. 1997); Langford v. Superior Court, 729 P.2d 822, 827 (Cal. 1987); see also Mark V. Lonsdale, CQB, A Guide to Unarmed Combat and Close Quarter Shooting; Specialized Tactical Training Unit 111 (1999) ("The stun grenade [flash-bang] may well have saved more lives than any other single piece of equipment in the SWAT inventory.").

While I certainly am not of the opinion that officers should force entry in all narcotics searches, see Richards, 520 U.S. at 393-94, I do believe that when officers are faced with an individual who has a criminal record involving guns, and the officers have information that the suspect is still involved with weapons, and that individual has just purchased approximately 20 kilograms of narcotics, the procedure the police used in executing the search warrant in this case was reasonable. I am, therefore, of the opinion that the majority's attempt to make the potential harm to a child a focal point of the case is misplaced (maybe even inaccurate because the record does not reflect that there were any

hiding places for a child). The majority's attempt to hypothesize about the existence of a hiding child (whom for all we know would have been protected from the effects of the flash-bang) is immaterial to what actually happened in this case. As discussed above, police conducted a fast visual inspection of the room and did not observe any children present. It was only after concluding that no children were present that the flash-bang was deployed and the police entered the apartment./8

Because I refuse to hold that officers are barred from using the necessary, precautionary measures such as the flash-bang device used in this case, I agree with the trial judge that, under the facts and circumstances of this case, the ERT's use of the flash-bang was within the limits of the fourth amendment.

The ERT's Use of Force to Tackle Jones

Finally, Jones argues that the ERT's execution of the search warrant was unreasonable because "[t]here was simply no basis for agents . . . to rush over to [him] and strike him in the head and tackle him to the floor, when he did not immediately lay down on the floor as commanded."

In determining the reasonableness of the police officers' use of force in executing a drug search warrant, we balance the nature and quality of the intrusion of the defendant's fourth amendment interests against the nature of the threat the defendant posed to the police. See Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 592 (7th Cir. 1997), cert. denied, 118 S. Ct. 1052 (1998) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).

Here, after Officer Hastings entered the apartment, he repeatedly yelled at Jones to "get down." Despite Officer Hastings's orders, Jones abruptly stood up with his hands at his side and Officer Hastings "couldn't tell whether [Jones's hands] were clenched open or whether they had anything in them." The majority ignores the obvious fact that Jones's failure to comply with Officer Hastings's commands combined with Jones's failure to keep his hands in sight caused Officer Hastings to fear for his safety. Cf. United States v. Denney, 771 F.2d 318, 322 (7th Cir. 1985). In response to the apparent threat that Jones posed, and remembering that Jones had previously pled guilty to carrying a loaded firearm, I am of the opinion that the force Officer Hastings used to restrain and arrest Jones was justified. Furthermore, as soon as the officer determined that Jones was unarmed, he got off Jones, cuffed him, and seated him in a chair.

Accordingly, I am of the opinion that Officer Hastings's tackling of Jones in order to ensure his and the other officers' safety was not violative of the fourth amendment.

I refuse to join in a mandate that demands that law enforcement officers endanger their lives by outlawing the use of the tactics used in this case just because two members of the court would do something different with the benefit of hindsight. It is often said that judges have minutes, hours, days, weeks, and even months to make a decision, but officers have only a split second to make a life or death decision when entering the residence of a drug dealer and determining exactly how to restrain a person who has a criminal history involving weapons, has just purchased approximately 20 kilograms of narcotics, fails to follow officer instructions, and keeps his hands out of sight (whether intentionally or unintentionally). Recognizing the inherent dangers police officers face every day (especially those dealing with narcotics arrests) and ever cognizant that one should not judge a man until you have walked a mile in his boots,/9 I am of the opinion that the officers' actions, while aggressive,/10 were within the limitations of the fourth amendment. Consequently, there is no reason to determine whether Jones's confession was "connected" to the manner in which the officers entered the apartment and arrested him.

All this being said, I join in the decision to affirm the denial of Jones's motion to suppress.


/1 After Baez left Jones's apartment, F.B.I. Special Agent Jeffery Warren arrested him and detained him in a Decatur police transport van while Decatur police officers executed the search warrant.

/2 Contrary to the majority's statement that "[t]he police did not believe that Jones was an unusually dangerous drug dealer," there is more than ample evidence in the record to establish that Jones might very well have proved to be a very real danger to the lives and safety of the police officers. In anticipation of the controlled delivery, Illinois Police ran a criminal history check of Jones, and it revealed that Jones had a 1991 arrest for unlawful use of a weapon. Jones pled guilty to the charge, and the Cook County, Illinois, court sentenced him to one year of court supervision. Inspector Ed Root briefed the ERT members about Jones's weapons violation and advised the team that this should be taken into account in their planning of the entry into Jones's apartment. ERT members also testified that they had "knowledge

either directly or through others about Mr. Jones possessing firearms" on two other occasions and "that it was a possibility that he could be [armed] again." (emphasis added). In addition to this, Jones had just purchased a large amount of narcotics (almost 20 kilos) for $51,000. It is reasonable to assume that someone willing to make such a large expenditure would also be willing to use a weapon to safeguard it as well as himself. The particular danger Jones represented is also demonstrated by the fact that when Baez was initially en route to deliver the narcotics to Jones he felt it necessary to be armed with a 9mm handgun and two clips of ammunition. As a result of this information, ERT members planned their entry into Jones's apartment.

/3 The majority joins the defendant in his claim and states that the "[p]olice had little reason to apply a battering ram to a door that was already ajar." However, a battering ram is frequently used by law enforcement when executing a search warrant for a drug dealer's or other suspect's (whom they reasonably believe might be armed) residence, and may be necessary for a number of reasons in situations in which an individual refuses to answer the door. For example, given that this was a search of a premise where a large stash of narcotics were being held it is certainly possible that the front door to such a residence might be booby trapped. Even without assuming any such trap, it is also possible that the use of the battering ram was necessary because the officers could not tell, because the door was only open very slightly, whether objects or armed individuals were positioned directly behind the door. It is also possible that the door was chained or had some other form of additional restraint (such as a chair propped against the door or metal restraint) that would have prohibited the officers from gaining a fast entry, and therefore exposed them to unknown dangers, whether it be by physical assault or gunfire. I am firmly convinced that the use of a battering ram was probably the only safe method to ensure that the door opened as quickly as possible, both securing the officers' safety and preventing Jones from destroying evidence.

/4 A "flash-bang" is not a "bomb" as the majority improperly labels it. Rather it is a non-lethal device that produces a flash and a gunshot-type noise that stuns and disorients for about six to eight seconds. This diversionary tactic is effectively used by police departments, the F.B.I., and even military units to disorient suspects and ensure safety. See Jack H. McCall, Jr., Blinded by the Light: International Law and the Legality of Anti-Optic Laser Weapons, 30 Cornell Int'l L.J. 28 (1997). The majority, in an unsupported conclusion,

claims that the use of this device "created a risk that people close to the detonation point would be injured" and that "[c]hildren are especially vulnerable." If, as the majority hypothesizes, a child was hiding behind a piece of furniture, the child would not be "especially vulnerable," but rather would be protected from the bright light of the device. The fact that the child may be exposed to a potentially loud noise, does not, in my view, warrant the exclusion of the use of such a device. Rather than the unsupported statements of the majority, the record reflects that law enforcement threw the diversionary device into the room only after assuring themselves (to the extent that was humanly possible under the circumstances) that no children were present in the immediate area; a belief that turned out to be accurate. We note that it is ironic that law enforcement apparently had more concern for the child than did the defendant-Jones, who placed the child in an apartment with a large quantity of narcotics, drug paraphernalia, 26 live rounds of ammunition, and where gunfire might erupt at any time.

/5 At the suppression hearing, the ERT officers testified that although the dining room is not a separate room from the living room, it is not visible from the front door because of the "L" shape configuration of the living unit.

/6 In his motion to suppress filed with the trial court, Jones also argued that the physical evidence seized from his apartment should be suppressed because the officers executing the search warrant did not provide him with a signed copy of the search warrant as required by Fed. R. Crim. P. 41(d). While the majority correctly applies the exclusionary rule to the physical evidence seized from Jones's residence (i.e. the drugs), there is no need to address the issue because Jones has abandoned this argument on appeal.

/7 The majority relies on Richards v. Wisconsin, 520 U.S. 385 (1997), for its claim that it is "less certain" than the district court (and presumably myself) that the police did not violate the fourth amendment. I am puzzled by the majority's reliance on Richards because it dealt with the single question of whether the state of Wisconsin could legalize "no-knock" entries for search warrants in each and every narcotics case. In a very narrow holding, the United States Supreme Court stated that while Wisconsin could not create such a general rule, the facts of the particular case justified a "no-knock" entry. Given that it is undisputed that the officers knocked and announced their presence in this case, I find the majority's reliance on Richards inappropriate, unconvincing, and inaccurate.

/8 We note that if a child was present, a flash-bang device which disorients a suspect may actually serve to protect the child because cross-fire between officers and the suspect is less likely to erupt.

/9 156 officers in 1998 and 130 officers in 1999 died in the line of duty. See Nation in Brief, The Washington Post, Dec. 30, 1999 (1999 WL 30310974).

/10 See Graham, 490 U.S. at 397 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.")