UNITED STATES of America, Plaintiff,

v.

**Brian EBERLE and Christopher McIver, Defendants.**

**No. CR 97–058–M–DWM.**

United States District Court, D. Montana, Missoula Division.

Feb. 4, 1998.

Bruce C. Gobeo, Gobeo Law Offices, Missoula, MT, Doreen Antenor, Bailey Law Office, Missoula, MT, for defendants.

Kris A McLean, Office of U.S. Atty., Missoula, MT, for U.S.

## AMENDED ORDER AND OPINION

MOLLOY, District Judge.

### I.

Brian Eberle filed a Motion to Dismiss on January 13, 1998. Defendant Christopher McIver filed his Motion to Suppress on January 9, 1998. Defendant Eberle makes the same claim. An evidentiary hearing and oral argument on the motions took place on January 23, 1998.

After considering the briefs and the record, I find Brian Eberle's Motion to Dismiss should be **DENIED**. For reasons set forth below, the Motions to Suppress are **GRANTED**.

### II.

The evidence adduced at the hearing showed that a marijuana grow operation was discovered in the Sunday Creek area of the Flathead National Forest sometime before July 30, 1997. The U.S. Forest Service guided by Special Agent Lorney J. Deist ("Deist") then launched an investigation. Deist ordered the placement of surveillance cameras at the site of the marijuana grow. Two 35mm cameras and two video cameras were positioned around the site. *See* Appendix A, Def.'s Ex. A. The cameras operated from July 30 to October 4, 1997, were triggered by motion sensors.

Both defendants were photographed and videotaped at the site. McIver's Toyota truck was similarly recorded at the site. His identity was then traced through Montana's DMV. Deist commenced a surveillance operation against McIver when harvest time for the marijuana plants approached. As part of that surveillance operation, Deist and fellow officer Billy Stewart placed a Birddog tracking device and a global positioning system device on McIver's Toyota truck. This action happened in the early morning hours on September 22, 1997. The tracking devices were placed on the truck that night because in Agent Deist's estimation, harvest of the marijuana plants was imminent.

On the evening of October 2, 1997, Deist was informed by the officer on surveillance duty at McIver's residence that the Toyota left the residence at 8:45 p.m. Deist then went north on Highway 93 to the grow site. On the way, he picked up a signal from the Birddog tracking device. The signal indicated the Toyota was also proceeding north.

Deist contacted Agent Young, who positioned himself at the junction of Highway 93 and Radnor Creek Road, the turn-off for the Sunday Creek area. When Deist arrived at the junction he spoke with Agent Young. Young confirmed that the Toyota had turned off toward the Sunday Creek area. Deist then went on to Milepost 153, from which point he continued to monitor the Toyota via the Birddog device. Shortly after 10:00 p.m. the Birddog device indicated that the Toyota was on the move again.

Agent Deist returned to the Sunday Creek turn-off, and at approximately 10:30 p.m. he saw the Toyota leave Radnor Creek Road and go south. Deist said he followed the Toyota at a safe distance, driving at 50–55 m.p.h. At one point, about 10 miles from Kalispell, he found himself very close to the Toyota. When that happened, McIver's truck sped up to around 75 m.p.h. Deist radioed ahead to Officer Stewart. Stewart was on surveillance duty at McIver's house. Deist told Stewart that the Toyota appeared to be on its way back to the house. He told Stewart to position himself so he could observe the pickup on its return. Deist also radioed the County Sheriff's Office in Kalispell to request assistance.

Agent Deist testified that, because the Toyota sped up, he concluded that the occupants had detected his presence and were attempting to evade him. He acknowledged that when that happened, he did not speed up but continued to monitor the Toyota via the Birddog device. Agent Deist never lost contact with the Toyota. The Toyota took no detours or side roads but proceeded over 43

miles directly to the Eberle/McIver residence.

Meanwhile, Officer Stewart ("Stewart") had assumed position in an alley directly opposite the garage area of the McIver/Eberle residence. *See* Appendix B, Gov.'s Ex. 1. Around 10:50 p.m., the Toyota pulled onto the concrete apron in front of the garage. Even though it was possible to do so, McIver did not park inside the garage. Using a night vision monocular Officer Stewart observed the defendants remove large plastic bags from the back of the pickup truck. He saw the defendants glance up and down the street before removing the bags. From the way the defendants handled the bags, Stewart inferred the contents were not heavy. He observed what appeared to be plant stalks sticking out the bottom of the bags. His belief was based upon historical information he was aware of, and suggestions by other officers with whom he had spoken. Because the house had been staked out, police knew no others were in the house that evening.

Deist and Stewart then went to the County Sheriff's Office. Deist's calls and alerts to the law enforcement community meant that a number of officers had already assembled. In attendance were Deist, Stewart, Officer Freebury ("Freebury"), two or three other Flathead County Sheriff's officers and four officers from the Kalispell Police Department. The officers met to discuss their options based on the evidence, observations and information they had. Deist stated the purpose of the meeting was to decide what to do next. Most importantly, a collective decision was made that it would take "too much time" to get a warrant. No effort was made to contact any lawyer, judge or magistrate for guidance. Stewart testified that those present decided that the situation amounted to exigent circumstances. Stewart was familiar with the term "exigent circumstances" from reading case law.

The collective decision called for a planned approach to the house, to informally talk to the defendants about their marijuana growing activities. The plan was to knock on the door of the residence and to enter if invited to do so. Deist stated they did not know what they were going to do if refused entry.

Both Deist and Stewart testified that the option of applying for a search warrant was discussed at the meeting. They were both of the opinion that it would take too long to apply for a search warrant. Deist stated in his experience it could take ten or eleven hours to obtain a warrant due to the time it takes to properly prepare an affidavit in support of the application. To obtain a warrant telephonically might take six hours. The police did not opt to try for a warrant or to continue the stakeout until a warrant was obtained.

The officers then proceeded to the Eberle/McIver residence after midnight, near 12:30 a.m. Stewart and a Kalispell City police officer went to the front door. Deist and Freebury went to the rear of the residence. The two officers at the rear of the house entered a porch without making their presence known. This area is fully-enclosed, approximately six feet by ten feet, and unheated. It appeared to be used for storage. Deist knocked on the back door.

According to Officer Deist, McIver answered the door. McIver opened the door about a third of the way. Deist identified himself and McIver stepped back to allow Deist to enter. Freebury came in behind Deist. Deist then heard Freebury issue arrest commands, at which point, according to Deist, he drew his weapon and ordered McIver against the refrigerator. When the situation was under control, Deist learned that Freebury claimed he saw Eberle in the living room with contraband and had proceeded to arrest him.

After Eberle and McIver were arrested, other officers entered the house and a protective sweep of the premises was conducted. The protective sweep lasted about two minutes. The defendants were taken into custody and the house was sealed off until the application for a search warrant could be prepared and processed. In Deist's estimation, the whole operation, from entry into the house to sealing it off, lasted about half an hour.

Deist then returned to his office. There, he worked "all night" to complete an affidavit in support of a search warrant. A search warrant was executed on the premises at 1:00 p.m. that day. Police found a sophisticated marijuana grow operation in the basement.

### III.

Based on these facts, defendants assert various violations of their Fourth Amendment rights and consequently urge the suppression of all illegally seized evidence. First, defendants claim that the surveillance cameras set up to monitor the marijuana grow operation in the forest violated their expectation of privacy. Second, McIver claims that the placement of the tracking devices on his truck violated his Fourth Amendment rights. Third, each claims that the entry of the police into their home without a warrant was in violation of the Fourth Amendment. Next, they claim the protective sweep of the house made after the police entry was illegal. Finally, they claim that the search warrant obtained after the house had been sealed should be quashed.

Defendants first and second claims are rejected for the reasons set forth below. However, I find that the warrantless entry by the law enforcement personnel of defendants home violates the Fourth Amendment. All evidence found in the house is suppressed for that reason. It is, therefore, unnecessary to reach the remainder of defendants' claims.

### IV.

■ Defendants claim the surveillance cameras violated their right to privacy. Defendants have no standing to assert a Fourth Amendment interest in the area surveilled by the cameras unless they can demonstrate a reasonable expectation of privacy in that same area. *United States v. Nohara*, 3 F.3d 1239, 1241 (9th Cir.1993). A reasonable expectation of privacy exists if a person has an actual, subjective expectation of privacy and if the expectation is one society is prepared to recognize as objectively reasonable. *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Douglas, J., concurring).

■ At the suppression hearing both defendants testified that each has a subjective interest in privacy in the remote forest area in which they were photographed by the surveillance cameras. I do not doubt McIver and Eberle wanted privacy but under the circumstances, even if their expectation was subjectively reasonable, there is no Fourth Amendment violation. Claiming a privacy interest to grow marijuana in a National Forest is not an expectation of privacy that society is prepared to recognize as objectively reasonable.

The Supreme Court held that individuals "may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Oliver v. United States*, 466 U.S. 170, 176–78, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Here, it is not objectively reasonable to expect privacy in public land; land where anyone is free to roam or to wander for recreational purposes of hunting, fishing, or hiking. *Compare United States v. Juda*, 46 F.3d 961, 968 (9th Cir.1995) (no objective expectation of privacy in one's location on the high seas); *Sheppard v. Beerman*, 18 F.3d 147, 152 (2d Cir.) (no objective expectation of privacy in office furniture and file cabinets when others had open access to them). Accordingly, Defendants' first claim is denied.

■ Second, Defendant McIver claims that the tracking devices placed on his truck violated the Fourth Amendment. In *United States v. Knotts*, the Supreme Court held that the use of a radio transmitter to monitor an automobile's progress on public roads is not a search within the meaning of the Fourth Amendment. 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983). Further, the evidence adduced at the suppression hearing indicates that the truck was not within the cartilage of the home. *See Oliver*, 466 U.S. at 180 (cartilage encompasses area "immediately surrounding and associated with the home ... to which extends the intimate activity associated with the 'sanctity of a mans home and the privacies of life' "). Accordingly, McIver's claim is denied.

## V.

The challenge by defendants of the police entry into their home without a warrant is a violation of the Fourth Amendment. Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357. Here, law enforcement officers claim that exigent circumstances justified their warrantless entry of defendants, home. Exigent circumstances exist when there is probable cause for the search and evidence is in imminent danger of destruction. *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Planned exigencies are oxymoronic violations of an exception to the warrant requirement of the Fourth Amendment.

According to the testimony of Officers Deist and Stewart at the suppression hearing the facts giving rise to exigent circumstances were (1) the Toyota truck momentarily accelerating to approximately 75 m.p.h. on its 43 mile return journey to Kalispell, and (2) the defendants looking up and down the street before they unloaded the bulky plastic bags from the rear of the pickup truck.

To give any credence to the officers, claim in this regard would require a farcical distortion of the concept of exigent circumstances. Deist stated that in maintaining a steady speed of approximately 55 m.p.h. the occupants of the Toyota were behaving in conformity with persons transporting drugs because they were acting so as not to draw attention to the vehicle. He next inferred that because the Toyota picked up speed it was attempting to evade him because with the marijuana in the truck, McIver was trying to avoid the "tail." The logic is questionable because it presents a "Heads I win, tails you lose" proposition. At either speed the officer imputed criminal conduct to the occupants of the Toyota.

Deist acknowledged that he did not try to keep up with the Toyota. There is no evidence about how long the Toyota maintained the accelerated speed. Whatever its speed that night, Deist was always able to track the Toyota with the monitoring devices. There is *no evidence* that the Toyota took a circuitous route back to the residence. In short, evidence of evasive action on the part of the Toyota driver is flimsy. Also, any exigency that may have arisen because the Toyota accelerated had dissipated by the time it arrived back at McIver's house.

When the McIver Toyota drove up, Officer Stewart had the pickup and its occupants under surveillance. He was able to identify the defendants when they got out of the truck. He saw them look up and down the street before unloading the bulky plastic bags from the rear of the pickup. The defendants then walked to the house carrying the bags with them.

At this point, it is what defendants did not do that becomes significant with respect to gauging exigency. They parked in view of the street. They could have driven into the garage before unloading the truck. They did not run into the house. Nothing about their behavior indicates that they were fleeing from law enforcement in hot pursuit. There was nothing exigent in the circumstances faced by law enforcement when defendants arrived back at their house.

The law enforcement conduct that followed is so problematic that there are no facts that can reasonably be construed as exigent. Various law enforcement personnel gather at the County Sheriff's Office to assess the situation. Those present were assembled at the request of Officer Deist by radio contact as he returned to Kalispell. There, on the basis of a few reported cases read by one of the officers, the police made a legal determination that exigent circumstances existed. Significantly, no attorney was present or consulted at that meeting to provide guidance to the law enforcement officers on the legal consequences of their intended actions.

I do not hold that an officer must consult an attorney before acting appropriately, in light of his or her training and experience. By definition, exigent circumstances would preclude any such rule. But, where there is time to convene a meeting and to assemble a sizeable group of officers to plan a course of action, it is a mistake for officers to make legal determinations left by the Constitution to the sound judgment of an independent

Magistrate Judge. Finally, it is irrational to find exigency in a situation where law enforcement officers have the time to convene a meeting to discuss whether exigent circumstances exist. When true exigent circumstances exist, law enforcement must act to prevent the destruction of evidence, not convene a meeting to discuss the necessity of a warrant while evidence could be in the process of destruction.

The officers here rationalize their actions by opining it would have taken too long to obtain a search warrant, even by telephone. That it takes time to obtain a warrant is not enough, standing alone, to create exigent circumstances. If it were, the Fourth Amendment would be a nullity. The length of time it takes to obtain a warrant is only relevant if, coupled with some other factor, the two together create exigent circumstances. *See, e.g., United States v. Lai*, 944 F.2d 1434, 1443 (9th Cir.1991) (warrantless entry justified by belief defendant might destroy evidence and flee before warrant obtained due to likelihood he would discover that his accomplice had been arrested).

### VI.

■ Deist also testified that the officers planned to go to the house, interview defendants, and gain entry to the residence. He stated they had no idea what they would do if denied entry. Police officers may not take actions to create an exigency and use that to justify a warrantless entry to the home. *United States v. Richard*, 994 F.2d 244, 248–49 (5th Cir.1993); *United States v. Johnson*, 12 F.3d 760, 764 (8th Cir.1993).

Here though, Agent Deist says that he and his fellow officer received consent to enter the house. According to Deist, McIver opened the door about a third of the way, and then stepped back to permit the officers to enter. McIver testified that he heard someone knocking at the back door, went to answer, and upon opening the door was confronted by an officer with weapon drawn. McIver said he stepped back in alarm and the police officers came into the house.

The government bears the burden of proving that McIver gave his free and voluntary consent for police to enter the house.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). To determine whether consent was voluntary, courts look at the totality of the circumstances surrounding the consent. *Schneckloth*, 412 U.S. at 227. Here, whether the government has met its burden on the issue of consent depends on the credibility of Officer Deist's testimony.

■ It is apparent that after the officers met and conferred at the County Sheriff's Office, they elected to dispense with the warrant requirement until they could obtain entry to the house. They had no back up plan in the event they were denied entry. Obviously, the police knew that if they were denied entry, the defendants would be alerted to their presence and would have an opportunity to destroy evidence. Perhaps they hoped to prompt some reaction on the part of defendants that would enable them to enter the house under exigent circumstances.

The inference I draw is that when the officers went to the house they meant to gain entry one way or another. Under these circumstances, replete with indications of a coercive intent on the part of the police, I find that the government has not carried its burden of proof on the issue of consent. While the testimony of the investigating officers is more credible than that of the defendants on the investigation of the facts, I find the defendants version of what happened at the house is more credible than the testimony of the police. I find it hard to believe that if the police truly believed the circumstances were exigent, they would have walked to the back door of known drug dealers, after midnight, without a backup plan or without their guns ready.

### VII.

The officers in this case did fine investigative work. They successfully monitored a marijuana grow operation on national forest land. They identified possible suspects from photographs of vehicles taken at the grow site. They mounted a sophisticated surveillance operation against the suspects and tracked them to and from the site on the evening the marijuana plants were harvested. On the return of the Toyota vehicle to the vicinity of the grow site they covertly observed the suspects carrying bulky plastic

bags into the house. They observed stalks or something similar protruding from the bottom of the bags.

At this point, there is no doubt that the police had probable cause for a warrant to search the house and arrest defendants. No exigent circumstances existed to create an exception to the warrant requirement. There was no indication that the defendants knew they had been seen or detected by the police. The whereabouts of the defendants was known. The situation was under control and the only thing left to cap off good police work was to obtain a warrant.

■ Absent exigent circumstances, however, the police should have continued their surveillance of the house while they applied for a warrant. If defendants had attempted to leave while the police were awaiting the warrant, the officers could have arrested them without a warrant on the reasonable belief that they had committed a felony. *See United States v. Watson,* 423 U.S. 411, 418, 421 n. 11, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The police would then have been free to secure the residence until the warrant was issued. *See United States v. Perdomo,* 800 F.2d 916, 919 n. 3 (9th Cir.1986). The Fourth Amendment does not have a recognized exception for "good police work." [1] As such, the evidence taken from the house must be suppressed because of the warrantless search and the doctrine of the "fruits of the poisonous tree."

Therefore, IT IS ORDERED:

(1) Defendants' Joint Motion to Suppress is GRANTED. All evidence gathered in the illegal search is hereby suppressed.

---

**1.** The government argues for the application of the independent source doctrine. Under that doctrine, a warrant may be "untainted by a prior illegal search if the officers' decision to seek the warrant was not 'prompted by what they had seen during the earlier unlawful search.'" *United States v. Hill,* 55 F.3d 479, 481 (9th Cir.1995). To uphold a warrant on this basis, the district court must make an explicit finding that "the agents would have sought a warrant if they had not earlier entered defendants house." *Id.* at 481.

In this case I decline to make such a finding. Here, the agents had no intention of seeking a warrant prior to entering the house. They specifically rejected the option of obtaining a warrant, even telephonically, because in their opinion, it would be too time consuming to do so. Instead, they decided to enter the premises on the basis of exigent circumstances. In short, they assumed the role of the neutral magistrate. Under these unusual circumstances, the application of the exclusionary rule is fully warranted.