UNITED STATES of America,
Plaintiff,

v.

Lee C. GROCE, Defendant.

No. 02–CR–149.

United States District Court,
E.D. Wisconsin.

March 27, 2003.

Elizabeth Blackwood, Racine, WI, for Plaintiff.

Thomas G. Wilmouth, Milwaukee, WI, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Defendant Lee Groce is charged in a two count indictment with possession of a

firearm as a felon and possession with intent to distribute cocaine base. Defendant filed a motion to suppress the gun and drugs seized from his home pursuant to a search warrant. Magistrate Judge William E. Callahan, Jr. held a hearing on the motion and recommended that it be denied. Defendant objected, and upon reviewing the parties' submissions I decided to conduct a de novo hearing. *See* 28 U.S.C. § 636(b)(1).

In sum, here is what happened: law enforcement officers investigating a drug conspiracy went to defendant's home to conduct a "knock and talk" investigation. The officers claim that, after initially refusing, defendant's father consented to a limited search of the home, during which one of them observed cocaine in defendant's bedroom. Armed with this information, the officers obtained a search warrant for the home and during the subsequent search seized the firearm and drugs at issue.

Defendant contends that his father did not consent to the search, and that the officer lied when he claimed in the warrant application that consent was obtained. The government argues that defendant's father did consent, but even if he didn't, the search was justified as a "protective sweep." The government further argues that the officers would have obtained a search warrant even without the observation of cocaine, and thus the gun and drugs are admissible under the "inevitable discovery" doctrine.

I conclude that (1) defendant's father did not consent to the search; (2) the officers did not conduct a protective sweep nor was

such a sweep justified; (3) the evidence seized pursuant to the search warrant was the fruit of the previous unlawful search; and (4) the evidence would not have inevitably been discovered by lawful means. Therefore, defendant's motion to suppress must be granted.

## I. FACTS

On June 26, 2002, Detective Paul Kavanaugh and Officer David Lopez of the Milwaukee Police Department were assisting agents of the Drug Enforcement Agency (DEA) in an investigation of a drug trafficking conspiracy headed by one Marvel Belser. At about 9:30 a.m., Kavanaugh and Lopez were directed to 207 East Burleigh Street in Milwaukee to conduct a "knock and talk" investigation. The purpose of a "knock and talk" is to gain admission into the residence of a suspected drug dealer and obtain consent to search the premises. Kavanaugh and Lopez went to the door of the residence while six or seven DEA agents waited outside. Kavanaugh testified that he had no idea why he was directed to the residence. However, earlier that morning he had assisted in the execution of a search warrant related to the Belser investigation, and Rodel Babasa, the head DEA agent, testified that Kavanaugh had been de-briefed and that everyone knew they were going to 207 East Burleigh to continue the Belser investigation.

Kavanaugh and Lopez knocked on the door, and a young woman later identified as Rhandi Roberson opened it. Roberson allowed the two officers inside, and they proceeded through a porch into the living room.[1] Roberson indicated that only she and her young child were home. However, within a few moments defendant appeared.[2] Kavanaugh testified that defen-

---

**1.** Upon entering the residence, one crosses through a porch into the living room. To the left of the living room is a bedroom. Beyond the living room is the dining room, and to the right of the dining room is another bedroom. Beyond the dining room is the kitchen. Off the kitchen is a stairway that leads up to the

second floor and down to the basement. (*See* Def. Ex. 2.)

**2.** Roberson testified at the hearing that she had just woken up and believed she was the only adult at home.

dant came from the dining room, while Lopez stated that he came from the kitchen. Defendant asked the officers why they were there; the officers did not respond and instead directed defendant and Roberson to sit on a loveseat in the living room. The officers then heard a noise from the dining room area, and Robert Groce (later identified as defendant's father)[3] emerged from the bedroom off the dining room. Kavanaugh testified that because two men had appeared he asked Lopez to summon the DEA agents into the home.

Upon learning that Robert Groce[4] was the tenant, Kavanaugh and Babasa decided to speak with him in the kitchen. They asked him if they could search the residence for drugs. While they were speaking, defendant yelled from the living room, "don't let them search, Bob." Robert indicated that he would prefer if the officers obtained a search warrant.

Milwaukee police officer Miguel Correa then entered the home and was assigned the task of determining whether any of the occupants of the residence had outstanding warrants. Correa discovered that the Milwaukee Municipal Court had issued a warrant for defendant for nonpayment of a public drinking ticket. He advised Kavanaugh of the warrant, and Kavanaugh placed defendant under arrest. Kavanaugh checked under the cushions of the loveseat where defendant was seated and discovered a loaded clip for a pistol. He then placed defendant back on the loveseat and returned to the kitchen, where Babasa and Robert had remained.

Still attempting to obtain Robert's consent to search, Kavanaugh asked Robert if the officers could search for people. Ka-

vanaugh testified that he was concerned about the presence of others because he believed there might have been a gun in the home. Kavanaugh claimed that Robert agreed to the search, stating "that would be fine," and Lopez proceeded to search the upstairs portion of the residence. Kavanaugh also testified that he or Babasa suggested that Robert accompany Lopez, and Robert did so. Kavanaugh further testified that Lopez was gone for fifteen or twenty seconds, then returned and reported that he had observed what appeared to be cocaine on a plate in an upstairs bedroom.[5] Based on this information, the officers decided to obtain a search warrant for the residence from a Milwaukee County court commissioner.

Lopez and Babasa also testified that Robert consented to a search for people, but their testimony differed from Kavanaugh's and from each other's. Lopez said that he went into the kitchen and heard either Kavanaugh or Babasa ask Robert for consent to search for people, and that Robert agreed—but only if he could accompany the officer conducting the search. Lopez testified that he searched upstairs accompanied by Robert, that the search took several minutes, and that he observed cocaine and a scale in one of the bedrooms. Babasa testified that after Robert agreed to a limited search *he* suggested that Robert accompany Lopez upstairs.

Robert testified that he did not consent to a search. He stated when an officer went upstairs anyway he yelled, "Don't go up there." Roberson testified that she heard Robert refuse consent for a search and also heard him say "don't go up there" at the same time that she heard someone

---

**3.** Robert Groce is also Rhandi Roberson's uncle.

**4.** To avoid confusing defendant and his father, I will refer to Robert Groce as "Robert."

**5.** Lopez did not report seeing a gun in the bedroom, although when the search warrant was subsequently executed a pistol was discovered on the bed.

going up the creaky stairs. Officer Correa corroborated this testimony. He testified that he heard Robert say "don't go up there" after defendant had been arrested and the clip discovered, in other words, at the same time Kavanaugh and Babasa were seeking consent to search for people.

## II. DISCUSSION

### A. Consent to Search

■ Warrantless entries and searches of the home are presumptively unreasonable, subject only to a few narrow exceptions. *E.g., Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, officers need not acquire a warrant if consent is obtained. *See United States v. Dorsey*, 27 F.3d 285, 290 (7th Cir.1994). A voluntary consent "lifts" the warrant requirement. *United States v. Stribling*, 94 F.3d 321, 324 (7th Cir. 1996).

Consent can be express or it may be implied from the circumstances. *See, e.g., United States v. Wesela*, 223 F.3d 656, 661 (7th Cir.2000) (finding implied consent where defendant's wife called police, consented to their entry, did not object to search as it occurred, and provided information to officers during search). The government bears the burden of proving by a preponderance of the evidence that consent was voluntarily given. *See United States v. Basinski*, 226 F.3d 829, 833 (7th Cir.2000).

In the present case, Kavanaugh and Lopez were allowed into the home by Roberson. However, I find that Robert did not consent to a search; in fact, he vocally objected to it. I credit the testimony of

Officer Correa, Robert and Roberson over that of Kavanaugh, Lopez and Babasa.

Correa's testimony that he heard Robert yell "don't go up there" at the same time Kavanaugh and Babasa were seeking consent to search upstairs is highly significant. Obviously, Robert would not have said this had he agreed to the search. Kavanaugh and Lopez claimed that Robert never made this statement, but the government has offered no explanation as to why Correa would contradict his fellow law enforcement officers on this critical point. In any event, I find it implausible that Correa would testify falsely in this manner.

Correa's testimony corroborated Robert's assertion that he told Lopez not to go upstairs, as well as Roberson's testimony that she heard Robert say "don't go up there" at the same time she heard someone ascending the creaky back stairs. I found the testimony of Robert and Roberson to be straightforward and convincing. Thus, I find that Lopez went upstairs without having obtained permission, prompting Robert to yell "don't go up there."

For a number of reasons, I found that the testimony of Kavanaugh, Lopez and Babasa was not credible.[6] First, the demeanor of each was uncertain, in contrast to the assuredness I usually observe in law enforcement witnesses. Of course, just because a witness is nervous does not mean that he or she is lying. But the officers' demeanor here suggested something more than nerves.

Second, the testimony of these officers concerning what occurred after Robert allegedly gave consent did not jibe. Kava-

---

**6.** I acknowledge that in his recommendation Magistrate Judge Callahan stated that he found these officers credible. But Judge Callahan did not hear from Officer Correa, who seriously undermined the credibility of Kavanaugh, Lopez and Babasa on the critical issue in this case. One of the reasons why I ordered a de novo hearing was because defendant had been unable to obtain Correa's presence at the first hearing. I also wanted to hear the witnesses' testimony first hand before making a credibility determination.

naugh testified that he or Babasa suggested that Robert accompany Lopez upstairs, but Lopez claimed that Robert insisted on tagging along. Kavanaugh stated that Lopez was upstairs for just fifteen or twenty seconds, while Lopez claimed that he was upstairs for several minutes. These are not minor discrepancies.

Third, the officers' testimony about the nature of the search upstairs made no sense and cast doubt on their testimony that they had obtained consent. They claimed that Lopez went upstairs as a "protective sweep" because they were concerned that someone might be up there with access to a gun. As all of the officers testified, it is unnecessary to obtain consent to conduct a protective sweep.[7] Yet the officers sought Robert's permission nonetheless and offered no convincing explanation why. The officers also testified that it was highly unusual for a citizen to accompany an officer on a protective sweep. Yet the officers testified that they decided to take a sixty-four year old man along and again offered no good reason why.

Finally, Kavanaugh, Lopez and Babasa contradicted each other on issues unrelated to the search. For example, Kavanaugh claimed that he had no idea why he was sent to 207 East Burleigh, but Babasa said that all the officers had been debriefed and knew they were continuing the Belser investigation.[8] Kavanaugh and Babasa also contradicted each other regarding the circumstances of the entry of the DEA agents into the home. Kavanaugh said that after defendant and Robert appeared, he asked Lopez to summon the agents. But Babasa testified that he decided to enter the house when he did not

hear from the two officers inside and mentioned nothing about being asked to enter.

For all of these reasons, I conclude that Robert did not consent to this search. Rather, I find that the officers entered the residence at 207 East Burleigh on June 26 determined to search in continuation of the Belser investigation. When they could not obtain permission to do, they went ahead anyway. *Cf. United States v. Eberle*, 993 F.Supp. 794, 800 (D.Mont.1998) (rejecting government's claim of consent because "when the officers went to the house they meant to gain entry one way or another").

## B. Protective Sweep

■ The government argues that even if Robert did not consent to a search of the second floor, Lopez was authorized to conduct a protective sweep of the area following defendant's arrest. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

In *Buie*, the Court recognized two types of sweeps. First, "as an incident to arrest [officers may], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334, 110 S.Ct. 1093. Second, officers may search beyond the immediate area of the arrest if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be

---

**7.** I will deal with the protective sweep issue in more detail in the next section of this decision.

**8.** Lopez testified before the magistrate judge that he did not really know why he was sent to 207 East Burleigh, but before me he testified that he knew it was related to the Belser investigation.

swept harbors an individual posing a danger to those on the arrest scene." *Id.*

In the present case, defendant was arrested in the living room downstairs, and the search at issue occurred upstairs. Thus, the search may be justified as a protective sweep only if the officers reasonably suspected that a dangerous individual was upstairs. With respect to this standard, the Seventh Circuit has stated that

> the particular configuration of the dwelling and the characteristics of those known to be present and who might be present must be the primary focus of the officers' assessment. Moreover, although never adequate standing alone to justify a sweep, the general surroundings, especially its history in previous law enforcement efforts, must enter into the calculus. This latter estimation must be based on actual historical facts, not stereotypes. A protective sweep is not justified simply because an area is 'poor' or a 'housing project.' It is very relevant, however, that a neighborhood has been the recent scene of other violence or civil strife aimed at law enforcement officers or that there are other articulable reasons for believing that, at the present, the area presents a real threat to the safety of the officers.

*United States v. Burrows,* 48 F.3d 1011, 1016 (7th Cir.1995) (footnotes omitted); *see also United States v. Furrow,* 229 F.3d 805, 812 (9th Cir.2000), *overruled on other grounds by United States v. Johnson,* 256 F.3d 895, 913 n. 4 (9th Cir.2001) (noting that in *Buie* the Court emphasized the precautionary nature of the search, the seriousness of the crime involved, and the need of officers to protect themselves by securing the scene and preventing a surprise attack).

The government argues that a protective sweep of the upstairs was justified by the following facts: defendant was arrested in the house; a loaded clip was found under the sofa cushion; Roberson misled the officers concerning how many people were present; and, having emerged from the kitchen, defendant might previously have been upstairs. The government also contends that defendant was "disruptive," yelling at his father not to let the officers search.

For several reasons, I conclude that this search cannot be justified as a protective sweep. First, the conduct of the officers clearly revealed that their action was not really a protective sweep at all. All of the officers agreed that consent need not be obtained to conduct a protective sweep, yet for some reason the officers decided to ask Robert for permission to search for persons. If they had actually engaged in a protective sweep they would not have asked for Robert's consent. Further, if the officers truly feared for their safety from someone on the second floor, they would have conducted the sweep immediately after arresting defendant and would not have chatted with Robert for ten minutes in the kitchen before going upstairs. *See United States v. Chaves,* 169 F.3d 687, 692 (11th Cir.1999) ("Here, the government's own action undermines any claim that the entry had a protective purpose. It is undisputed that the sweep in this case did not immediately follow the arrest . . . .").

Second, the officers' testimony that they asked (or allowed) Robert, a sixty-four year old man whose ability to move was limited, to accompany Lopez on a search for an armed and dangerous person undermines the notion that officers believed that a danger lurked upstairs. The law enforcement witnesses agreed that it was highly unusual to permit a civilian to accompany an officer on a protective sweep. Correa offered two examples of when a citizen might accompany an officer—if a

dog was present and might attack the officer, or if children were present who might be spooked by an officer—neither of which was relevant here. Kavanaugh testified that a citizen might accompany an officer if the citizen did not trust the officer. But this makes no sense if the purpose of the sweep is to ensure safety. Why would an officer permit an antagonistic civilian to accompany him on a potentially dangerous maneuver? Lopez testified that Robert accompanied him because Kavanaugh okayed it and because that was the only way Robert would allow him to go upstairs. But if there truly was a danger upstairs, Robert's desires were irrelevant.

Third, the selective nature of the sweep reveals that the officers did not really believe they were in danger. The officers did not fully check possible hiding places on the *first* floor, such as closets and the bathroom, before tramping upstairs. Nor did they check the back porch or the basement.[9] Further, Lopez testified that he was not looking for someone hiding with a gun but rather was checking for other people, period. He went upstairs without drawing his weapon and did not otherwise proceed in the cautious manner a true protective sweep would require.

Fourth, nothing about the configuration of the dwelling suggested that a search of the upstairs was required for officer safety. The government asserts that because defendant emerged from the kitchen it was reasonable to assume that he had been upstairs. But the officers' testimony is conflicting on where defendant came from: Kavanaugh said that he came from the dining room, Lopez from the kitchen. Even if defendant was in the kitchen, it would be as reasonable to infer that he had come from the basement. As noted, the officers did not check the basement. Moreover, even if defendant had come from upstairs, there was no reason to infer

that he had left an armed colleague behind. The officers heard no noises from the second floor, nor did they have any information that others lived there. True, Roberson did not advise the officers that defendant and Robert were home (very possibly because she did not know it). But all of the occupants emerged immediately. Again, it is telling that the officers conversed comfortably with Robert for about ten minutes before going upstairs. *See Furrow*, 229 F.3d at 812 (finding invalid protective sweep that occurred after officers had rounded up those present).

Fifth, none of the three occupants posed a danger to the officers. Robert and Roberson were cooperative and docile. Defendant did yell for his father not to allow a search, but there is no evidence that he threatened the officers' safety. To the contrary, it appears that he followed all of the officers' directives. In any event, defendant was handcuffed at the time of the search and, surrounded by officers, posed no threat to anyone. There were approximately ten law enforcement officers present in the house at the time of the alleged sweep (six or seven DEA agents and three Milwaukee police officers). Thus, residents and possible guests were considerably outnumbered. *See United States v. Akrawi*, 920 F.2d 418, 420–21 (6th Cir. 1990) (finding invalid protective sweep of second floor where defendant was arrested on first floor, occupants offered no resistence, defendant was handcuffed during search, fifteen officers were present, officers heard no noises from second floor, and search did not immediately follow arrest). Moreover, I refuse to accept the paradox that a person's objections to a search of his home can justify the similar invasion of a protective sweep.

Finally, nothing in the record suggests that 207 East Burleigh was a dangerous place for law enforcement officers. There

---

9. Defendant's exhibit 2 shows all of the possi-    ble hiding places the officers left unchecked.

was no evidence that the home had previously been a law enforcement target, that it was the site of previous arrests or violent behavior, or that any of its residents were wanted for or suspected of violent crime. *Cf. United States v. Barker,* 27 F.3d 1287, 1291 (7th Cir.1994) (finding sweep valid based in part on officer's previous experience in the house).[10]

That leaves the discovery of the clip, and the possibility that there was a gun somewhere in the house. But without a legitimate basis for believing that someone was upstairs to access the weapon and use it against the officers, the clip itself was insufficient to justify a protective sweep.[11] Therefore, Lopez's search of the upstairs portion of the residence cannot be upheld as a protective sweep, and the government does not argue that any other exception to the warrant requirement applies.

## C. Validity of Search Warrant

■ Lopez's search of the upstairs portion of the residence, during which he observed cocaine in defendant's bedroom, was unlawful. But the evidence at issue was not seized during that search. Rather, it was seized later pursuant to a search warrant. Therefore, I must decide whether the evidence seized pursuant to the warrant was tainted by the previous, unlawful search. *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (stating that question is whether, granting establishment of the

primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint); *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939) (stating that exclusionary rule may apply to evidence later discovered and found derivative of an illegality, or "fruit of the poisonous tree"). There are two components to this inquiry. *United States v. May,* 214 F.3d 900, 906 (7th Cir.2000); *United States v. Markling,* 7 F.3d 1309, 1315 (7th Cir.1993); *see also Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

First, I must decide whether the illegally discovered evidence affected the court commissioner's decision to issue the warrant. *Markling,* 7 F.3d at 1315. In other words, removing from the warrant application the information unlawfully obtained (i.e. the observation of cocaine by Lopez), was there still a sufficient basis to establish probable cause? *See Segura v. United States,* 468 U.S. 796, 814–15, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *cf. Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (holding that when police deliberately and recklessly include false information in warrant application, the warrant is valid only if the other information in the application, standing alone, is sufficient to establish probable cause).[12]

---

**10.** In *Buie* the defendant was arrested based on a warrant for armed robbery. Here, defendant was arrested based on a municipal court warrant for failing to pay a ticket for public drinking.

**11.** On this point, it is worth noting again that during the "sweep" Lopez overlooked or ignored a pistol lying on defendant's bed.

**12.** Defendant filed his motion to suppress pursuant to *Franks,* arguing that Lopez lied when he stated in the warrant application that consent had been obtained. I have found

that Robert did not consent and, therefore, Lopez's statement to the contrary in the warrant application was inaccurate. However, the issue of whether the evidence seized pursuant to the warrant is admissible is best analyzed under the Markling/*Murray* "independent source" approach. This is so because the "lie" in the warrant application was that consent had been obtained, not that Lopez saw cocaine. Removing the "lie" from the warrant application still leaves the observation of cocaine, which is sufficient to establish probable cause. The proper inquiry is

Second, I must decide whether the officers' decision to seek the warrant was prompted by the illegal search. In other words, would they have applied for the warrant even if Lopez had not unlawfully gone upstairs and seen the cocaine in defendant's bedroom? *Markling*, 7 F.3d at 1315–16. Both questions must be answered in the affirmative in order for the evidence to be admissible. *May*, 214 F.3d at 906.

The first question is easily answered in the negative. Excising from the warrant application the statement that Lopez observed cocaine leaves absolutely nothing upon which probable cause to issue a search warrant could be based. (*See* Def. Ex. 4.) In fact, aside from defendant's address, the only information specific to this investigation added to the pre-printed form Lopez used to apply for the warrant consisted of his observation of cocaine and a scale. (Def. Ex. 4 at 2, ¶ 5.) Absent this information, no magistrate would have issued a warrant.

It is also clear that the officers were motivated to seek the warrant because of Lopez's search. Lopez and Kavanaugh, the officers who procured the warrant, both testified that Lopez's observation of cocaine caused them to seek out the court commissioner.

In *United States v. Saari*, 88 F.Supp.2d 835 (W.D.Tenn.1999), *aff'd*, 272 F.3d 804 (6th Cir.2001), the court confronted a similar situation. There, officers arrested the defendant on the landing of his apartment, then proceeded to "search the apartment over defendant's vocal objections." *Id.* at 845. During the search, the officers observed but did not seize several weapons. Two days later, based solely on the knowledge they had acquired during their post-arrest search of the defendant's apart-

ment, the officers obtained a warrant and seized a variety of weapons. *Id.*

The defendant filed a motion to suppress the evidence seized pursuant to the warrant. In response, the government argued, first, that the defendant had consented to the officers' post-arrest entry into his apartment. The court rejected the argument, finding that under the circumstances any consent was involuntary. *Id.* at 849. The government next claimed that the search of the apartment was a valid protective sweep. The court rejected this contention, as well, because "no facts [were] articulated to support a belief by the officers that any other individual was in the house." *Id.* at 850.

Finally, the government argued that the issuance of the search warrant purged the taint of illegality. The court acknowledged that this argument would have been persuasive if the information on which the warrant was secured had not been derived from the initial entry. *Id.* at 851 (citing *Segura*, 468 U.S. at 813, 104 S.Ct. 3380). However, the court noted that

the search warrant affidavit relies entirely on the information observed during the initial unlawful entry. The affidavit recites that the officers had gone to defendant's apartment on March 14 and "observed numerous ... weapons, ammunition, high capacity magazines, and a listening device." Nothing in the affidavit refers to any independent source of information regarding what the defendant might have had in his apartment. Thus, this case is distinguishable from the facts in *Segura* where officers obtained the search warrant based on information wholly unrelated to the entry. Accordingly, the search warrant did not purge the taint of illegality as it was based entirely on

whether, removing the statement that cocaine was observed, there was sufficient evidence to establish probable cause. As the *Markling* court observed, this approach is basically the same as that outlined in *Franks*. 7 F.3d at 1316.

the "fruit of the poisonous tree." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Thus, the evidence in this case should be suppressed pursuant to *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

*Id.* at 851.

For identical reasons, the evidence seized pursuant to the warrant in the present case must also be suppressed. The initial search was not justified based on consent or as a protective sweep, and the information derived from that search was the basis for obtaining the warrant. Thus, the evidence seized pursuant to the warrant was the fruit of the poisonous tree.

### D. Inevitable Discovery

█ The government's final argument is that the officers would have sought a warrant, even if Lopez had not observed cocaine, based on the discovery of the clip and the fact that defendant was a convicted felon. Therefore, contends the government, the evidence "inevitably would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The government states that neither the initial entry into the home nor the discovery of the clip was unlawful, and that Babasa testified that he would have sought a search warrant for the firearm based on the discovery of the clip and defendant's status as felon.[13]

The inevitable discovery doctrine is an exception to the exclusionary rule. Under the doctrine, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Nix,* 467 U.S. at 444, 104 S.Ct. 2501. "[W]hat makes a discovery 'inevitable' is not probable cause alone, ... but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the [unlawful] search." *United States v. Brown,* 64 F.3d 1083, 1085 (7th Cir.1995).

"Inevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof." *United States v. Jones,* 72 F.3d 1324, 1334 (7th Cir.1995). The government must produce reliable testimony that it would have discovered the challenged evidence through lawful means, not mere argument or supposition. *Id.* As the court noted in *Jones,* "It is all too easy to imagine in retrospect lawful avenues through which the government might have obtained evidence that in reality it came upon in contravention of the Fourth Amendment. Speculation and assumption do not satisfy the dictates of *Nix,* however." *Id.*

Even if I assume, *arguendo,* that there was sufficient evidence to establish probable cause to issue a search warrant for a firearm,[14] the government's argument fails.

---

**13.** It is appropriate to address this issue even though I have answered both prongs of the *Markling* inquiry negatively. This is so because the "inevitable discovery" doctrine is distinct from the "independent source" doctrine, upon which the *Markling* inquiry is based. *Markling,* 7 F.3d at 1318 n. 1. "The inevitable discovery doctrine applies where evidence is not actually discovered by lawful means, but inevitably would have been. Its focus is on what would have happened if the illegal search had not aborted the lawful method of discovery. The independent source doctrine, however, applies when the evidence actually has been discovered by lawful means. Its focus is on what actually happened—was the discovery tainted by the illegal search?" *Id.*

**14.** Because it is not unlawful for persons other than felons to possess a weapon in the

I simply do not believe that the officers would have sought a warrant based on the discovery of the clip.

Only Babasa testified that a warrant would have been sought based on the clip. It is significant that Kavanaugh and Lopez both testified that the decision to seek the warrant was based on the observation of cocaine, and that Lopez did not even mention the clip in the warrant application. *Cf. Eberle*, 993 F.Supp. at 801 n. 1 (declining to apply independent source doctrine where officers specifically rejected the option of obtaining a warrant based on information they possessed prior to an unlawful entry).

Further, for several reasons, Babasa's testimony on this point was not credible. First, he testified that after Robert stated that he would prefer that the officers obtained a search warrant, he (Babasa) told Robert that they were going to go apply for one. But no other witness corroborated this testimony. Second, the credibility of Babasa's testimony that he would have sought a warrant based on the clip is undermined by the fact that he made no effort to do so, but instead continued to attempt to obtain Robert's consent to search. Intentions can often be inferred from actions, and Babasa's failure to attempt to obtain a warrant based on the clip strongly suggests that he would not have done so. Third, Babasa's demeanor gave me no confidence in the veracity of this claim.

Finally, there is a strong policy reason not to apply the inevitable discovery doctrine in this case. The Supreme Court has long held that the exclusionary rule, while at times costly to society because it permits the guilty to go unpunished, is nevertheless needed to deter police from violating the Constitution. *Nix*, 467 U.S. at 442–43, 104 S.Ct. 2501. As the Court noted in *Segura*, "The suppression or exclusionary rule is a judicially prescribed remedial measure and as 'with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.'" 468 U.S. at 804, 104 S.Ct. 3380 (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)).

The case before me demands application of the exclusionary rule. The officers conducted a warrantless search of a home, over the protestations of the occupant. They then submitted a warrant application in which they misrepresented that they had obtained consent for the search. It would undermine the integrity of both our judicial procedures and constitutional protections to admit evidence based on the officers' claim that they *would* have gotten a warrant based on honest, lawfully acquired information after they *actually* obtained a warrant based on an illegal search and a warrant application containing false information. Similar conduct will be deterred in the future only if the evidence is suppressed.

home, probable cause for a warrant could have existed only if at the time he sought the warrant Babasa knew that defendant was a felon. It is not at all clear that probable cause existed because the record does not disclose when Babasa learned that defendant was a felon. Correa testified that he did not run record checks (as opposed to warrant checks) until after defendant was arrested. He was unable to recall whom he told of

defendant's status as a felon, but stated that he probably relayed it to one of the DEA agents standing near him. Babasa did not state when he obtained this information. If Babasa did not know that defendant was a felon at the time that he would have applied for the warrant, probable cause would not have existed based on the discovery of the magazine alone. *Cf. United States v. Lemons*, 153 F.Supp.2d 948, 959–61 (E.D.Wis.2001).

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion to suppress is **GRANTED.**